1 | **DAVID MICHAEL BIGELEISEN (SBN #68681)**
101 Howard Street, Suite 310
2 | San Francisco, CA 94105
(415) 957-1717
3 | e-mail: dmbigeleisen@gmail.com
Attorney for Defendant:
4 | KENNETH MARTIN KYLE

5

6 | **IN THE UNITED STATES DISTRICT COURT**

7 | **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

8

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| Plaintiff, ) | **CASE NO. CR 10 0245 JSW** |
| ) | |
| - against - ) | **SENTENCING  MEMORANDUM** |
| ) | |
| KENNETH MARTIN KYLE ) | **DATE:      OCTOBER 13,  2011** |
| ) | **TIME:      2:00 PM** |
| Defendant. ) | **COURTROOM:  11, 19th FLOOR** |

*[Left margin, vertical text]* DAVID MICHAEL BIGELEISEN ATTORNEY 101 HOWARD STREET, SUITE 310 SAN FRANCISCO, CALIFORNIA 94105 (415) 957-1717

17 | INTRODUCTION

18 | This memorandum will present information and evidence of mitigation for the

19 | Court to consider in sentencing.

20

21 | MR. KYLE IS AMENABLE TO TREATMENT

22 | Mr. Kyle was evaluated by Stewart B. Nixon, Ph.D., and Pat Potter McAndrews,

23 | M.A.. Their report is attached.

24 | One considers the facts which give rise to Mr. Kyle's conviction.  One wonders,

25 | what would lead an intelligent, educated man to do such things?  The

26 | Nixon/McAndrews report and analysis provide some information.

27

28 | SENTENCING MEMORANDUM

1       Mr. Kyle's father was an alcoholic.  His mother was clinically depressed.

2   It is common for two people who have these afflictions to find one another.  Their

3   problems are visited upon their children.

4       Mr. Kyle has suffered with depression all of his life.  The depression was such

5   that he was unable to find pleasure or joy.  Thus the behavior, and thus this case.

6       But Dr. Nixon and Ms. McAndrews opine with confidence that Mr. Kyle is

7   amenable to treatment.

8       Mr. Kyle is intelligent and educated.  He is capable of insight.

9       The year and a half that Mr. Kyle has spent in jail have not been spent in vain.

10  He has considered the things which he has done.  He has reflected on the harm he has

11  done to others.

12      Education, intelligence and insight make treatment easier.

13      Most importantly, Mr. Kyle wants to be treated.

14

15  TEACHING

16      Mr. Kyle has offered to teach other inmates while he has been housed in Oakland.

17  The sheriff has not made this available for security reasons.

18      But the opportunity to teach others can be made available in the Federal

19  Penitentiary.  This is especially the case if Mr. Kyle is kept at a facility which houses

20  sex offenders such as himself.

21      In most cases, inmates in Federal institutions are put to work as teachers if they

22  have had any college education.

23      Teaching will be a form of repentance and renewal.

24  ///

25  ///

26  ///

27

28  SENTENCING MEMORANDUM                          2

DAVID MICHAEL BIGELEISEN
ATTORNEY
101 HOWARD STREET, SUITE 310
SAN FRANCISCO, CALIFORNIA 94105
(415) 957-1717

1  REMORSE

2      Mr. Kyle is remorseful for what he has done.  He has expressed this to the

3  probation officer and he will express it in open court.

4      He is remorseful for the harm which he has caused the child and those who

5  surround her.  He is also remorseful for the harm he has done to his own family.

6      Please see Mr. Kyle's letter to the Court.

7

8  THE ST. LOUIS COUNTY MISSOURI MATTER

9      Mr. Kyle is accused in St. Louis County, Missouri of charges which are

10  substantially the same as those which were initially presented in this case.  If convicted,

11  his exposure is five years to life.

12      At this time, the prosecutor in St. Louis County will not discuss any resolution

13  which would include dismissal of the state court counts.  Nor will she discuss the

14  possibility of a concurrent sentence.

15

16  THE SAN FRANCISCO COUNTY MATTER

17      Mr. Kyle is accused in Superior Court. San Francisco County of Penal Code

18  Sections 311.3(a) (a misdemeanor) and Penal Code Section 311.11(a) a felony.  These

19  reflect accusation of possession or distribution of child pornography. The maximum

20  exposure is three years in the State Prison.  The prosecutor in San Francisco County will

21  consider either a sentence concurrent with Mr. Kyle's Federal sentence, or a dismissal.

22  This decision will be made after this Court has passed judgement on Mr. Kyle.

23

24  CALCULATION OF MR. KYLE'S AGE UPON RELEASE

25      Mr. Kyle will be an old man when he is released from the penitentiary.  The

26  following is a calculation of Mr. Kyle's age upon his release if the court follows the

27

28  SENTENCING MEMORANDUM

3

DAVID MICHAEL BIGELEISEN
ATTORNEY
101 HOWARD STREET, SUITE 310
SAN FRANCISCO, CALIFORNIA 94105

(415) 957-1717

1   agreed upon punishment of 360 months or if the court follows the punishments

2   recommended by the probation department.

3         Mr. Kyle was born on March 11, 1964.  He was arrested on March 20, 2010.

4         Thus, Mr. Kyle was 46 years old when he was arrested.  All of the following

5   calculations reflect Mr. Kyle's term of imprisonment to be deemed to commence on

6   March 20, 2010.

7         At 360 months of imprisonment, Mr. Kyle will be 76 years old upon his release.

8         At 360 months of imprisonment, but with credit of 15%, Mr. Kyle will be 71 ½

9   years old upon his release.

10        At 405 months of imprisonment, Mr. Kyle will be 79 years, nine months old upon

11  his release.

12        At 405 months of imprisonment, but with credit of 15%, Mr. Kyle will be 74

13  years, eight months old upon his release.

14        Mr. Kyle's father died at the age of 70.

15

16  THE ADAM WALSH ACT

17        The Adam Walsh Act, 18 U.S.C. 4248 (2006) provides that upon the conclusion

18  of Mr. Kyle's prison sentence, the government may institute a civil proceeding against

19  him.  If it is found by clear and convincing evidence that Mr. Kyle remains a sexually

20  dangerous person, then he can be restrained pursuant to such civil commitment.  He can

21  be released when it is found that he is no longer sexually dangerous.

22        This provision of the law should be adequate to address any fears that Mr. Kyle

23  will offend upon his release.

24  / / /

25  / / /

26  / / /

27

28  SENTENCING MEMORANDUM

4

DAVID MICHAEL BIGELEISEN
ATTORNEY
101 HOWARD STREET, SUITE 310
SAN FRANCISCO, CALIFORNIA 94105

(415) 957-1717

DAVID MICHAEL BIGELEISEN
ATTORNEY
101 HOWARD STREET, SUITE 310
SAN FRANCISCO, CALIFORNIA 94105

(415) 957-1717

1   LETTERS OF SUPPORT

2       Attached are letters from:

3       Robert Brem

4       Daniele D. Flannery, Ph.D.

5       Tania Israel, Ph.D.

6       Stefanie Ulrey

7       Pam Vadeboncouer

8       Robert Wolf, M.D.

9       David Stempien

10      Irene Baird D.Ed

11      Sam Michalowski, Ph.D.

12      Judi Gibbons

13      Priscilla Kleinman

14      Wanda and Herbert Moreland

15      Bernard Lafaso

16      Each of these letters reflect how the author came to know Mr. Kyle, and what his

17  or her relationship with Mr. Kyle consisted of.

18      The letters are very consistent. They reflect a caring and thoughtful man.

19      Mr. Kyle has done something very repellent. But people who do bad things are

20  not always entirely bad people. Many of them have good in them as well.

21      Mr. Kyle has friends who love and care for him, and he has the capacity to be a

22  friend.

23      Mr. Kyle has good in him too.

24  / / /

25  / / /

26  / / /

27

28  SENTENCING MEMORANDUM

1   PLACEMENT CONSIDERATIONS

2       Kenneth Kyle will be sentenced to a lengthy federal prison term.  His family

3   consists of a mother, sister and brother-in-law all of whom reside in Louisiana.  Since

4   Mr. Kyle's arrest and jail confinement, both his mother and sister have kept in close

5   contact with him.  As documented by the Bureau of Prisons, visiting is an important part

6   of an inmate's incarceration – specifically to maintain family ties.

7       In our research of Bureau of Prison's (BOP) facilities, two medium security

8   institutions were found within 500 miles of Louisiana: FCI Beaumont, Texas and FCI

9   Three Rivers, Texas.  We are aware that the final determination for a specific institution

10  of designation lies with the BOP but that a judicial recommendation is a factor highly

11  considered in an initial placement of a defendant by the Designation and Sentence

12  Computation Center located in Texas.  Both of these institutions have programs to

13  manage Mr. Kyle's mental health and medical needs.

14      Additionally, Mr. Kyle asks the Court to recommend that when time eligible, that

15  Mr. Kyle be transferred to one of the BOP's Sex Offender Treatment Programs whose

16  goals are: to decrease the risk of sexual re-offending, increase resiliency and improve

17  quality of life both in prison and following release, build health rewarding and

18  meaningful relationships and develop a sense of meaning and purpose in life.

19      Finally, that the court be apprised of the following: to meet the civil commitment

20  mandates of the Adam Walsh Act, the Sex Offender Certification Review Board in

21  Central Office initiates review of sex offenders 18 months from their projected release

22  date that allows sufficient time to determine whether civil commitment should be

23  recommended.

24      Mr. Kyle implores the Court to use it's judicial powers and recommend placement

25  at either FCI Beaumont, Texas or FCI Three River, Texas.

26  / / /

27  / / /

28
    SENTENCING MEMORANDUM                  6

DAVID MICHAEL BIGELEISEN
ATTORNEY
101 HOWARD STREET, SUITE 310
SAN FRANCISCO, CALIFORNIA 94105
(415) 957-1717

CONCLUSION

Mr. Kyle's conduct was reprehensible. It is very repellent.

At the same time, Mr. Kyle is not a completely bad man. He has good in him too. He has done good for others in the past.

Mr. Kyle is a good candidate for treatment. He will have plenty of time to reflect and to take advantage of treatment.

Mr. Kyle is remorseful. He knows that what he has done is wrong. Understanding that one's acts are wrong is the very first step toward redemption and renewal.

The sentence agreed upon is 360 months. We ask the Court to give Mr. Kyle hope. We ask the Court to sentence as agreed. Mr. Kyle will be an old man when he is released. Thus, Mr. Kyle can hope that he will be released to have a bit left of life before he dies.

Respectfully submitted,

Date:   October 7, 2011

DAVID MICHAEL BIGELEISEN
Attorney for Defendant:
KENNETH MARTIN KYLE

SENTENCING MEMORANDUM                 7

DAVID MICHAEL BIGELEISEN
ATTORNEY
101 HOWARD STREET, SUITE 310
SAN FRANCISCO, CALIFORNIA 94105

(415) 957-1717

# Stewart B. Nixon, PhD.
# Pat Potter McAndrews, M.A.
### 1515 The Alameda, Suite 202
### San Jose, CA 95126
### 408-287-2103

May 30, 2011

David Michael Bigeleisen, Attorney
101 Howard Street, Suite 310
San Francisco, California 94105

Re: Kenneth Kyle

Dear Mr. Bigeleisen;

As per your request, an evaluation for Kenneth M. Kyle was performed at the Glenn Dyer Detention Facility in an attempt to provide some understanding and explanation for his egregious behavior. I might add that this type of case is most unusual in the field, and Mr. Kyle's behavior patterns are atypical for a sexual offender.

Ken Kyle started life inheriting a long family history of depression. To make matters worse, addiction is present in every member of his immediate family in at least one manifestation per member, and sometimes two. Mr. Kyle grew up in a sexually puritanical home where the only expression of sexuality was abusive. Such an environment coupled with profound depression creates a formula for failure.

Early on Ken realized that his depression was profound, and entered the therapeutic environment seeking help which he did not find. He received counseling from two different providers, plus an Adult Child of Alcoholics counselor to no avail. He then received treatment on two other occasions as an adult with no relief. He also went to his family practitioner for medication, but did not receive adequate care, as this type of depression can only be treated effectively by a psychiatrist. Such poor treatment results led Mr. Kyle to further thoughts of hopelessness.

Another problematic development for Mr. Kyle that developed as a result of his childhood, was a learned sense of helplessness. He watched his mother ineffectively try to deal with his father's inappropriate behavior, and deduced that nothing could change the outcome of his or her life. He also learned to defer to others and not take the lead in making appropriate decisions for himself, which created problems in his sexual decisions years later.

Due to the dysfunctionality of his family, Ken grew up feeling different from others and did not fit in with society. His father repeatedly told him that Ken was responsible for all the pain in life that his father experienced. He told him that Ken was worthless. To compensate, Ken developed a sense of aloofness and feelings of inadequacy. He

interacted little, and found himself failing at socialization and maintaining meaningful relationships. He quickly learned that he could excel in academia, and through his perfectionism, pursued a career that helped cover up the pain of his failure at life. He developed a defense system that led him to react in an opposing manner to his thoughts and soon found his behavior appearing as though he were superior to others. Such a behavioral pattern in psychology is called Reaction Formation, and is quite common in this type of situation. That behavior further alienated him from reaching out to others.

It is interesting to note that even though Mr. Kyle led a life of social alienation, he still felt a strong commitment to making the world a better place, and kept himself quite busy volunteering for various social agencies such as Habitat for Humanity and Amnesty International. Working for a cause could help compensate for overwhelming feelings of loneliness and inadequacy.

As is common in the case of alienation, the computer soon develops a place in a person's life to help fill the void created by not connecting to the real world. Ken soon relied on visiting web sites and viewing pornography for long hours to satisfy his needs for connecting. He would pose in different roles to communicate with various people exploring alternate and deviant sexual expression.

Since Ken was not aware that severe depression stifled sexual response, he mistakenly kept stepping up his sexual experiences notch by notch, hoping to find some sexual response that he could enjoy. Anhedonia (the inability to feel pleasure) is a common side affect of severe depression, and can only be corrected by medical treatment instead of accelerating sexual experiences.

The Millon Clinical Multiaxial Inventory III was administered to statistically verify clinical impressions as to the measurement of mental health with Mr. Kyle. This inventory scored Mr. Kyle's depression higher than I have ever seen in thirty years of practice. One score was the highest possible score attainable for depression! Anxiety scores followed close behind. Ken scored an 84 on the Cognitive Autistic Facet Scale Score, as well as other high scores that represent depression, apathy, fatalism and paranoid projection. Such scores clearly indicate an individual who cannot function nor think clearly due to his mental state. This device suggests the diagnoses of Major Depressive Disorder and Generalized Anxiety Disorder. These diagnoses are certainly consistent with all clinical impressions for this client.

Therefore, it is with confidence that one can state that this unusual case is the result of years of improperly treated anhedonia, which led to a series of accelerating and inappropriate sexual behaviors that could have been mitigated by proper medical treatment. Depression is a medical condition that responds well to treatment which could then ameliorate the behavior and rehabilitate Mr. Kyle after proper care.

These types of cases are most difficult to administer, as such offenses strikes our hearts with the indignity of the crime. It is often impossible to sort out personal disgust caused by these actions from the sexual acts themselves. Such biases make it a challenge to mete out an appropriate penalty for these actions. It would be our recommendation that one approach these crimes in as objective manner as possible, trying to be cognizant of the

fact that these crimes stem from an untreated medical condition that can be addressed in the future with proper medical treatment.

Should further information be necessary regarding this most unpleasant case, please do not hesitate to contact our office.

Respectfully submitted,

Pat Potter McAndrews, M.A., BCPC

Stewart B. Nixon, Ph.D.

October 4, 2011

Honorable Jeffrey White
United States District Court
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge White,

I am to express my sincere regret for causing all the harm
I have through my selfish and reckless criminal misconduct.
With the hindsight afforded me by nineteen months in jail
in solitary confinement, I feel I have cleared my head some-
what and "detoxed," so to speak. And what I find looking back
is disgraceful, painful, embarrassing and shameful. As time has
passed I have come to appreciate more fully just how much I
have harmed the child, her family and their friends, my family
and friends, and even strangers who were misfortunate enough
to learn of my deplorable behavior. I am especially remorseful
for the distress I have caused the child and for the distress she
has experienced in being separated from her family.

Your Honor, I cannot begin to know the pain and distress I have caused
her family as well as my own. Based upon communication with
family and friends of my own, I know that I have caused emotional
turmoil, self-doubt, self-recrimination, angust, anger and
disgust among those closest to me. I am certain I have caused
similar pain and feelings of dismay among my co-defendant's
supporters as well.

If I could go back and undo what I did, redirect my actions
and choose alternative paths so as not to have inflicted the
harm I have, I would do so unhesitantly. I fear the avenues
open to redemption are limited as I will be imprisoned for the
vast remainder of my life. Nevertheless, I hope that I can make
some headway toward making amends. While full redemption
seems beyond my reach I am committed to doing all I can to
make some positive contributions while incarcerated.

-2-

Perhaps through teaching, analysis of what and how I went wrong, and even through sharing my mistakes in a therapeutic environment, I will be able to make a positive impact. If given the opportunity, I would like to teach while imprisoned. I am a skilled teacher versed in classroom and individual instruction. Thus, I may be able to help other inmates with their basic educational skills, literacy, GED, etc.

Regardless of the possibilities available for teaching, I would very much like to be placed in a situation and environment that provides treatment for my condition. I fully realize my problems require outside assistance, my solo attempts to address them have proved unsuccessful, and so I welcome professional assistance. Besides professional assistance, I will continue to use my time while incarcerated to reflect upon my misdeed and to hopefully grow through self-reflection.

Your Honor, I know what I have done is wrong; I only hope I can undo or at at least ameliorate some of the harm I caused.

Thank you for your consideration.

Sincerely,

Kenneth K

September 5, 2011

To:     Charles Mabie
        United States Probation Officer

Re:     Kenneth Kyle
        Considerations in the Sentencing Process

Dear Mr. Mabie:

I have been asked by Kenneth Kyle and his legal council to write of my understandings regarding the
character of Kenneth Kyle – in light of his charges and the process of sentencing.  It saddens me greatly
to have to write this.  Not because I cannot speak of his character but because certain "demons" in Ken's
inner life overpowered the basic good in him I know to be real.  As a psychotherapist myself, I do not
seek to excuse.  Rather, I seek to understand and help you to know him more as an aid in your
recommendations.

I have known Ken Kyle since the 1980s when we were at Arizona State University in our graduate
studies.  Though, in truth, he and I became better friends after he went on to Penn State in the 1990s -
as he became my advisor in my quest for full time employment as a college professor.  He was a
professional confidant with me in this and I credit his guidance (in part) with my final success in this
endeavor.  In 2004 I moved to the East Bay with a full time job and, soon, also had a part time teaching
job at CSU East Bay.   Out of his desire to live and work on the West Coast (to escape a depressing life
and job in Pennsylvania, and to seek to reinvent himself), Ken sought out a job with CSU in the
department wherein I was teaching.  It was my turn to return the favor and ultimately by 2006, Mr. Kyle
gained employment at CSU.

It was then that I and Ken became more substantive friends working on projects together and engaging
philosophically on issues of great import relative to justice and psychology.  In this time, he had
consulted (since 2005) on a major grant we were writing and implementing (seeking to address
community life and ultimately violence prevention in the East Bay).  In this time as well, he became
friends with my close associate and friend Ms. Stefanie Ulrey (who was also working on this project at
the time).  Soon, we three became good friends going to wine country and eating at establishments and
being mutually supportive in addressing the stressors of work and life.

Neither of Ms. Ulrey nor I ever heard nor saw anything to suggest the depth of his stress and depression
and the destructive acts these would impel him to eventually engage.  As a therapist I understand how
darkness can be so destructive.   As a friend I see other sides to him.

I also know that when he was needed to step up and be supportive of others – Ken was first in line.  He
listened to his students – some of whom we taught in common.  They expressed to me their deep
surprise that one so trusted and beloved and competent in helping them achieve their dreams could
have fallen so to his inner turmoil.  It was this memory – his being there for others in compassion – that

enables his friends and former students to try and understand him. By way of example, he gave the most intense feedback to his students to support them in being successful, more than any other professor I know! In this he devoted many hard hours beyond what most of his colleagues would devote. I know this effort was also delivered at great cost to his psyche. One can only be supportive so long before one breaks if one does not know how to disengage. Ken did not know how to disengage.

A further and more personal example of Ken's capacity for service to others is as follows. When I was in need of serious community support from my circle of friends to be able to function through a year of surgeries – Ken (along with Ms. Ulrey and a small circle allowed me to literally survive). Ken in particular devoted easily twelve hours a week to helping me. Even when stressed, he did so. The willingness to be of service was evident in his willingness to be of assistance to me and his other friends. In this, I know Ms. Ulrey would agree we are right to be grateful for having known him.

He cared for his community and demonstrated this by devotion his academic efforts here in the East Bay to the Violence prevention project. He engaged his students in this effort and was seen as a crucial partner in our project.  His loss was devastating and the reason for his loss further so. We do not seek to excuse, but rather we seek to understand and note that this was not an evil man - but a flawed man. His all too deep self doubts of his worthiness led him to succumb to his distorted perceptions that he was in fact not a good man. However, it is here that he faltered - to "prove to himself" he was not evil (at least), he sought in a psychodynamic mind trap to expose himself to evil (to prove he was not that)... And in this he ensnared himself in the details of actions that became his fall – perhaps not being evil but doing so.

**Ken Kyle is a tragic figure.**  In the midst of demonstrable great and good character and devotion to justice and to friends, was an indescribable self defeating and ultimate self and other destructive character flaw.   For these he deserves dire consequences, and he knows as much.  It has engendered in him a chance to self reflect on the consequences of his life.  However, in terms of a chance of justice, **he deserves more treatment than punishment** and in the process of treatment were he able to use his knowledge, skills, and talents to engage in behaviors that could serve as a kind of recompensatory justice, he could still be of service and find healing.    If our system of justice has any capacity for enabling redemption, this would be Ken Kyle's hope.  I it is to this end I have written here.

If you have any questions please feel free to contact me. I am;

Sincerely;

Robert J. Brem
510-748-6558 (home)
democratis@msn.com

September 10, 2011

CharlesMabie
United States Probation Officer

Dear Mr Mabie:

I am writing this letter on behalf of Ken Kyle who is to be sentenced on October 13th of this year.

I have known Ken for about 12 years. We first met when he was hired at Penn State Harrisburg for an academic position in the Behavioral Sciences position. I was a professor of Adult Education and was leading a doctoral program in that discipline. Because of overlapping scholarly interests, Ken and I were often on the same doctoral committees, a few master's committees, and some other academic committees. Over time we became good friends and as my husband, John Schmitz, got to know Ken more, they too became friends. We socialized together, had great dinners and discussions and when Ken left PSU, but returned to the area to visit folks, he stayed in our home. In time, we considered Ken a part of our family, and still do.

I know that Ken has entered a plea of guilty to a crime. After knowing Ken the whole idea is so mind-boggling to me that I have no words...only confusion.

What I can offer is a picture of the Ken I know, the Ken I call my brother, and hopefully that will help you in your decision-making.

Ken is very intellectually bright, always reading books on ideas, taking time to think about them, and connecting them to some new way of looking at things. It's exciting to be part of whatever is his current discussion, but also difficult to keep up because he is so far ahead.

Ken is kind of quiet person who takes in all his surroundings. He feels for anyone who is marginalized or singled out because of some trait or other. On campus he was a constant advocate for gender equality (which was very unusual in our school). He was also a consummate advocate for working students, their needs regarding scheduling, internships, research and so forth.

Ken gives one hundred percent to whatever he takes on. He was extremely conscientious about preparing for his classes, about helping students do research and write with him. He gave far more time than most professors. And when he bought a home in Arizona, he spent every free summer moment learning how to repair and update the place..the physical cost didn't matter.

Ken nurtures friendships with all kinds of people. If you are a friend of Ken's you would hear from him several times a year at least, either by phone, email or in person, and these connections weren't superficial, but rather focused on what was going on in your life. He has friends all across the world, and we know about his friends because he talks about them and their families as if they were a part of our extended family. He

September 10, 2011

CharlesMabie
United States Probation Officer

worries about his friends and if someone was sick, or just not making it, Ken would visit
and try to do whatever he could to support them.

Ken is generous. When people have a need, Ken is there. I never knew him to say he
didn't have time when asked for help... eg. for snow removal, or small repairs or just
listening. At one point we came up short financially and Ken sensed this and lent us
money for a year without a word. At other times various professors needed to have
more papers published and Ken would help them out by connecting them with people
he knew who could help or by writing with them.

Ken is tenacious. He suffers from depression, and has the entire time I have known
him; a kind of all-pervasive depression that would engulf him. It was painful to watch
and would last a long time. Ken struggled to present a self that was not under this cloud
and those who knew him superficially would never have known, but the rest of us
did...even if Ken didn't say anything. He didn't complain, just slogged along, and
nothing seemed to help. What a terrible disease. (I am grateful that in the Center
where Ken has been residing that he has received medication and assistance for this; it
does seem to have helped him.)

As for his sentencing, I am aware that he must atone for what he did. I would hope that
in the process of that he is able to continue to receive medication and counseling for
depression. I also hope that he will receive individual or group counseling for his
behaviors that led to this particular crime.

Thank you for your consideration of what I have written. If I can be of further
assistance, please do not hesitate to call me at 717 761 4643.

Sincerely,

Daniele D. Flannery

Daniele D. Flannery, PhD.

# TANIA ISRAEL, PhD

Charles Mabie, United States Probation Office
c/o David M. Bigeleisen, Esq.
101 Howard Street, Suite 310
San Francisco, CA 94105

September 11, 2011

Dear Mr. Mabie,

I met Kenneth (Ken) Kyle in 1994. We were close friends for about six years following our acquaintance while we were both in graduate school and for a few years afterward. During that time, we spent a great deal of time together, shared a house for a year, and I considered him one of my closest friends. Our friendship has been somewhat distant for the past decade, consisting primarily of occasional calls and brief in-person visits.

When I learned in March 2010 of Ken's criminal behavior, I was shocked. I could not imagine the person I knew had done these acts. Communication with Ken has been difficult since that time, and so I still do not know enough to make sense of it, but it is clear to me that I didn't have the full picture of who he was. I suspect that the courts also do not have a sense of Ken beyond the criminal charges and news stories. Thus, I want to share with you a picture of the Ken that I knew so that you can make your recommendations based on a more complete understanding of him. So that you can have some context for my remarks, I will tell you that I am a psychologist, but I never served as Ken's therapist, so I have an understanding of human behavior and yet, an incomplete understanding of my friend, Ken.

Ken loved and was loved by his friends. We were part of a close group of friends, and we all went on hikes together, met for weekly coffee gatherings, and went away for weekend trips. We celebrated each others' successes and supported each other through difficult times. We laughed a great deal together. Ken loved world travel, good wine, and talking about ideas and politics. Ken was a supportive colleague. He was sympathetic when I felt discouraged in my work and gave me the confidence to succeed. Ken challenged my thinking and helped me to understand theories and research outside my field. We collaborated on an article, and Ken was a very responsible first author and extremely easy to work with. I completed my dissertation, in part, due to our marathon writing sessions. During these years, Ken was very high-functioning interpersonally and intellectually.

From what I can piece together about what happened to Ken in recent years, it seems to me that his mental health deteriorated considerably. We've been corresponding over the past 18 months, and I've gotten a sense that medication has been helpful and that more intensive therapy would be beneficial. Ken has expressed tremendous remorse, shame, and concern for those he has harmed. More than anything, he seems to want to make a positive contribution to society – he has offered me assistance as an editor, has been writing poetry, and has been humble and appreciative when he has been able to make or maintain any meaningful human connection.

1553 Marquard Terrace, Santa Barbara, CA 93101
E-mail: taniaisrael@gmail.com
Phone: 805-705-4023

I hope Ken will be placed in a facility that can provide treatment for his mental health. Moreover, I hope the court will consider separating him from the general inmate population. I suspect that living within the general prison population would put him in danger (from which he is ill-equipped to defend himself) and cause his mental health to further deteriorate. Ken has considerable educational training and experience, as well interpersonal skills. If given the opportunity, he could contribute to his environment.

Feel free to contact me if I can provide any additional information that will be helpful to you. I appreciate you taking the time to read my letter and to provide the court with a full account of who Ken was and is.

Sincerely,

Tania Israel

Stefanie Ulrey

240 Bay Street, Apt. 408

San Francisco, CA 94133

September 4, 2011

Charles Mabie

United States Probation Officer

**RE: Mr. Kenneth Kyle**

Dear Mr. Mabie:

I am writing to you on behalf of Kenneth Kyle. Words cannot express the shock and grief I feel because of his current situation, but I hope that what I write here will add clarity to your understanding of his character.

My acquaintance with Mr. Kyle originated from a professional association in 2005. At that time my friend and colleague, Mr. Robert Brem, and I were working together on a grant at College of Alameda where we are both instructors. Mr. Brem had written a grant proposal to create a Service Learning program at our campus and he referred to Mr. Kyle, a longtime friend and former classmate as well as a professional associate, to consult on this grant as an editor and grant writer. My understanding is that Mr. Kyle also had a background in community psychology and social justice that proved very helpful to the development of our project.

At that time, Mr. Kyle was teaching at University of Pennsylvania. He had accepted a position at California State University East Bay in 2006, but was able to negotiate a one year delay in his start date. He moved to California to begin in this new position in 2007. Prior to his actual move, I met Mr. Kyle in person several times as he traveled here to prepare to take up residence. In fact, as he expressed interest in living specifically in San Francisco, I assisted him

with information about the neighborhoods and their features, and I even offered him a driving tour to help him get his bearings. We became good friends, and the three of us (Mr. Brem, Mr. Kyle and I) are still quite close.

I am sure that Mr. Brem will elaborate on his friendship and professional association with Mr. Kyle after Mr. Kyle moved here in his own letter, but I will add here that the grant project mentioned above became the seed project of a new grant, which Mr. Kyle made a part of his own tenure research. This project involved a partnership between our college and CSU East Bay which had his students working closely with ours. I mention this only to illustrate that Mr. Kyle was a deeply engaged and committed instructor, both to his students and to his field, and that through this collaboration, he was clearly working towards bettering his program at CSU and our community in general.

On a personal level, I can say that Mr. Kyle's friendship was a pleasant surprise and a deeply appreciated addition to my life at the time and it continues to be, even under the current circumstances.

At the same time he was settling in to his new home here in San Francisco, our friend Mr. Brem's health was rapidly deteriorating. Mr. Brem was at one time extremely obese, and his body was beginning to show signs of severe strain and even breakdown. He decided to undergo stomach bypass surgery. As none of the three of us had any family in the area (with the exception of one of Mr. Brem's sisters), Mr. Kyle and I became the primary figures in his recovery. We worked as a team to assist him with everything: doctor appointments, hospital recovery, recovery at home, and even re-entry into his work routine. It was a tremendous amount of work because Mr. Brem was also suffering from degeneration in both his hips, which made it exceedingly hard for him to move. Mr. Kyle offered his assistance with steadfast devotion for nearly a year. He even went so far as to drive Mr. Brem to work on the occasions when they were both teaching at CSU. As we each helped with Mr. Brem's home care, we frequently met at Mr. Brem's apartment to keep him company during his recovery. These were always evenings filled with laughter and good cheer as we settled down with some kind of takeout dinner and DVDs to watch. I remember that holiday season in particular; I made Christmas dinner for the three of us, and Mr. Kyle made us dinner on New Year's Day. He took the care to prepare a traditional meal from Louisiana, his home state, which he explained would bring bounty and good luck in the New Year. Mr. Brem and I were touched by his thoughtfulness.

Our triangle of friendship continued from that time. When Mr. Brem underwent hip replacement surgery in both hips, Mr. Kyle and I again stepped in to assist. Our evenings of good meals and cheerful conversation continued. Later, when it was my turn to be "in need," Mr. Kyle stepped up again. I had decided to move to a new apartment in the summer of 2009,

and when I asked Mr. Brem and Mr. Kyle to come over to help me pack up my current home, Mr. Kyle readily offered his help and worked with me the entire day. The first night I arrived in my new apartment, he and Mr. Brem were the first to come over to see the place and to congratulate me. A week later, when I had to put my long time pet companion to sleep because of systemic cancer, he was there again to console me.

So I hope I have shown you my experience with Mr. Kyle has been nothing but positive. He has been a friend to me in both good times and bad. He has been a guest at my holiday table and he has sat across a hospital bed with me as we cared for our mutual friend. And all the while, there was *never* any indication that he was suffering from the darkness that has led him to where he is now. I have always known him to be a gentle and honorable man, and he is *still* my cherished friend. I only wish that he had confided his troubles to me. If I could have done something to help, I would have without hesitation.

Please consider all this while you review Mr. Kyle's case. If there is any way I can add more details or clarify anything I have written here, please do not hesitate to contact me at the number or email below.

Sincerely,

Stefanie A. Ulrey

(415) 441-0291, home

(415) 515-5290, cell

Sulrey1680@aol.com

9 September, 2011

Mr. Charles Mabie

United States Probation Office

Dear Mr. Mabie: I am writing to you on behalf of my friend, Kenneth (Kenny) Kyle who will be sentenced on October 13, 2011. I hope that I can shed some light upon the man I know for you and your team so that you can accurately evaluate what the best course of action will be for his sentencing.

My friendship with Kenny spans almost 30 years: we met in the fall of 1982 at Loyola University in New Orleans. I had just moved to the state of Louisiana in my junior year and he was a freshman. We played husband and wife in a college play and began our friendship through this pairing. Kenny quickly became my best friend while he was at Loyola, and later when he moved back to Baton Rouge and other areas in the southwest, we were frequently in contact with one another through letters, phone calls and occasional visits. My friendship with Kenny was as close as any friendship I have had with my female friends, and although we did not share a romantic relationship, our friendship became a very important part of my life during this time. I trusted him with some of my most personal problems and sought his advice on numerous occasions about matters both personal and professional. He has always been a person I could trust and a loyal friend, regardless of the miles between us. We have not seen each other as frequently in the last 10 or 15 years, but I have no reason to believe that he is not the same kind, trusting and compassionate person I knew back in the 1980s and 1990s.

There is a saying that one can be "too smart for his own good" and perhaps in Kenny's case, this may have proven to be true. Ironically, often when one is as intellectually advanced as Kenny, it is much harder for that individual to find help when life begins to take a downturn. In Kenny's case, I don't know if he ever learned how to ask for help in the past and his intellect may have led him to believe that he could fix his problems without intervention. Unfortunately, in cases like his, the person must fall hard in order to understand the gravity of his problems and I believe that this has already happened with him. The good news is that I can honestly say with all of my knowledge and heart, Kenny now knows that being intellectually advanced does not necessarily make a person wise or happy. Like all of us, he has learned that he must ask for help whenever he finds he cannot cope with life instead of trying to do it on his own.

I do not know the particulars of his crime or what part he played in it, but I do know this: it's simply uncharacteristic of the man I know. There was nothing I ever witnessed about his behavior or his belief system that fits. Kenny has always treated both me and my family with great respect and has continually kept up with us throughout the years as our lives have grown and changed. My trust in his ability to lead a normal life has not changed. In fact, I think that through this experience of incarceration, he has learned much more about himself: both his strengths and shortcomings. This has given him a much more realistic view of the man he really is, without the barrier of his intellectual shield that he has worn for so many years.

Based on my personal knowledge of Kenny and through our most recent letters, I see this change in him as a very positive indication that he wants nothing more than to help those he can through his own gifts and talents. I have seen some wonderful changes in Kenny since his incarceration that have given me great hope. One of the most important changes is his interest and passion to do something to help others: I want to see him realize his true potential, not only for himself, but for those around him. Please consider this when you ultimately decide his fate. This is a man with much to offer the world, but he needs hope that what he brings to the table will ultimately one day give him the freedom to have a fulfilling life outside of prison in the years to come.

Sincerely,

Pam Vadeboncoeur

Robert Wolf, MD
24 Carriage Lane
Newark, DE 19711

1 September, 2011

Charles Mabie, United States Probation Office
c/o David M. Bigeleisen, Esq.
101 Howard Street, Suite 310
San Francisco, CA 94105

**Re: Kenneth Kyle**

Dear Mr. Mabie,

Ken Kyle has been my friend for 18 years, and for a year in 1996 and 1997, he lived with
me in the home my then-wife and I shared. He has visited me since at various points
around the country as our paths have diverged, but we have always stayed in touch.

I consider him to be, despite the charges he faces now, one of my better friends. I know
it's hard to separate the person from his actions, and that he must answer for them, but I
hope this letter serves to paint a fuller picture than the mug-shot and prison garb person
you see today. There was a time when Ken was a worldly, caring, intellectually curious,
funny and compassionate citizen of a close group of 30-something friends that lived in
Tempe, AZ in the mid 1990's. I still cherish those times I spent with him.

I should begin by saying that I was shocked and bewildered (and angered) by the events
that unfolded in March, 2010. No normal person speaks openly about their sexual
proclivities, even with close friends (and certainly not so if they are as disturbing as the
ones Ken has pleaded guilty to), so none of his friends had any inkling knowledge of his
crimes, until they became painfully public.

In fact, this whole situation has been terribly sad for all who know Ken, not only for the
damage done to his victim, but because he also faces the loss of the rest of his life and
career, over actions he knows were wrong, but apparently felt powerless to stop. Sadly,
those actions will forever define his life in the eyes of society, the courts, and the penal
system. But there is much more to him.

Ken Kyle is the kind of man who I could count on to help me move my apartment, or set
up my barbecue, or go out for a beer with when I had a difficult day at work. He has an
off-beat sense of humor and wry, deadpan delivery with an appreciation of absurdity that
made him by turns hysterically funny and endearing to all our friends. He enjoyed hiking
in the Superstition Mountains, debating social ills and how to remedy them, and being an
academic, though I never thought took that latter role too seriously to laugh about it.

He is a motorcycle enthusiast who enjoyed riding to his vacation home in northern
Arizona, and when the house was not rented, he gladly shared it with friends.

Oddly, of all the people I knew, his moral compass, which seemed to have failed him in
his final months of freedom, always seemed true. On many occasions, Ken and I spoke

2/2

openly about personal matters that we disagreed about, but I always appreciated his willingness to engage in debate, in ways that few people I have met before or since were willing to do. I had the sense that he was willing to do what he felt was right, even if it was difficult, or of he had to admit that he had done something about which he was not proud. I appreciated that he was willing to face his problems. Today, I pray that he uses that trait for rehabilitation (though I think we all recognize that societal pressures currently favor punishment instead). In the last 18 months I have spent a lot of time wondering whether, had I been a better friend and reached out more, if I could have had him seek help and avoid his current fate.

I hope you can gather information from his many friends about who he is as human being, frailties and faults as well as strengths, and suggest to the court that despite the nature of his actions in 2009, if released he still has something to offer the world.

To have him sit in prison for 30 years, in a general population with hardened criminals, would be a serious loss for everyone and serve no one. And, to be frank, it would probably kill him. Instead, I hope you can find enough information from those who care about him to see that there is something worth saving here. I hope you might suggest that intensive counseling, rehabilitation, and even a shorter sentence might release to the world a man who might even have some productive years to right his wrongs, teach and counsel, and ultimately regain some semblance of the man he once was and could still be.

Ken will remain in my thoughts and prayers for years, and will always reside in a sad, damaged place in my heart. It's hard to talk about him with my friends and wife, because they don't know him as I once did. Strangely, though, I can still see him smiling and laughing on desert hikes, and I continue to hope against hope that he will one day be healed, whole, happy and free.

Thank you for your consideration and your time.

Sincerely,

Robert Wolf, MD

Mr. Charles Mabie
United States Probation Office

September 6, 2011

Dear Mr. Mabie,

I am writing on behalf of Kenneth Kyle in regards to his sentencing scheduled for October 13, 2011.

I have known Ken since 1993, when I met him through my wife. They had been graduate students in Political Science at Arizona State University a few years prior to that and had remained friends. In the time I have known Ken, I have considered him one of my best friends.

This is quite a difficult letter to write. But when I knew Ken, I considered his character to be strong. He was a creative and critical thinker, and a true academic. We'd have provocative discussions about important social issues. He was always a force for the underprivileged; he argued and wrote in favor of equality and justice. He was a passionate protester for good.

Even though he lived in Pennsylvania or California most of the time I knew him, he would often travel back to Arizona to visit during breaks in the academic calendar. I visited him several times while he lived in both places, and when he was on sabbatical staying at his home in Flagstaff. He often arranged camping trips for our group of friends, and he planned my surprise birthday trip to Hawaii (which my wife bought for me) for my 40th birthday.

Ken was someone I felt I could always confide in. I still don't know the extent of what happened regarding his conviction, but I wish I could convey the depth of my shock as a measurement of the kind of friendship we had before this happened.

Please consider these statements in regards to Ken's sentencing.

Sincerely,

David Stempien
1701 W Saragosa St
Chandler, AZ 85224



Womens Enrichment Center

RECEIVED

OCT -- 4 2011

DAVID MICHAEL BIGELEISEN

September 30, 2011

To:      Charles Mabie, United States Probation Office

From:   Irene C. Baird, D.Ed., Affiliate Professor

Re:      Kenneth Kyle


I am pleased to write concerning Kenneth Kyle but must add that my comments are based on a collegial, academic relationship.

Professor Kyle was recognized and respected on our Penn State Harrisburg campus for conducting classes and research projects that were thought-provoking.  They involved analytical thinking designed to stretch the students' perspectives.  Since I conduct humanities-oriented programs I was invited on several occasions to speak to his students about my work. Our socializing was of the "over a cup of coffee" type of discussion, primarily of an academic nature and my humanities interests.  I know relatively little about his personal life and held him in regard for his academic stature.  When news of his "issue" was circulated on campus, there was disbelief; I, for one,  thought this alleged behavior was so completely inconsistent with that of the scholar, the intellect I knew.

 I am sorry I cannot add more; I regret that the academic community will miss a fine scholar.

Sam Michalowski Ph.D.
7000 Boulevard East 15T
Guttenberg NJ 07093

September 9, 2011


Charles Mabie
United States Probation Office


Mr. Mabie,

I have been asked by attorney Michael Bigeleisen to write a letter on behalf of his client,
Kenneth Kyle, whom will be sentenced with regards to his guilty plea of traveling from one state
to another to commit a led act with a child. I believe I am a good position to comment on Mr.
Kyle's character as I knew him both personally and professionally for many years. It is my only
hope that this positive character reference can in some way encourage the sentencing judge to
impose the fairest sentence possible considering the circumstances.

I met Mr. Kyle while starting graduate school at Arizona State University in 1994. He
was a more advanced student and I was quickly drawn to him both because he "knew the
ropes" so to speak about graduate school, but also because we shared the experience of
having lived abroad. Mr. Kyle provided me with many grounding conversations about career
paths and making sense of our intercultural experiences. Our friendship grew on the basis of
other personal experiences such as suffering from bouts of depression, persevering though
difficult childhoods and managing difficult family situations. Mr. Kyle introduced me to several of
his good friends, and together we enjoyed many excursions such as a three day hike of the
grand canyon, motorcycle trips as well as social outings.

After I left Arizona in 1997, I kept in close touch with Mr. Kyle and invited him to be my
best man at my first wedding in 1999. He stayed with me and first wife with a group of close
friends as a sort of honeymoon collective at a cabin in upstate New York. After that time, our
careers took us to different places, but we kept in touch via email and the telephone and saw
each other at a few academic conferences over the following decade. I knew he was very
frustrated with living in Harrisburg, PA. As a consolation, he bought a house in Flagstaff, AZ,
where he spent the summers. (I should also mention that my father, a professor, knows Mr.
Kyle professionally though the Society for the Study of Social Problems.) I saw Mr. Kyle last in
New York City in the summer of 2007 where he was attending a conference. It was there that I
learned he had accepted his second job in San Fransisco. We had a long dinner and caught up
and I made a promise to come visit him in his new life out west.

At all times during our close friendship, I found Mr. Kyle to be an exceptionally warm,
caring, thoughtful and loyal friend. He was as quick to share the difficult times as he was to

share humor and fun. I was able to confide in him at a level I have seldom experienced with another individual. His passion for social justice was only surpassed by the way in which he cared for his friends, of which he had far more than I. I can honestly say that as an adult I have never had a better platonic friend than Mr. Kyle.

It is from this perspective on his character that the crime that Mr. Kyle has admitted to committing is so absolutely and bizarrely puzzling to me. There was nothing whatsoever in Mr. Kyle's behavior which would have indicated that he was capable of such an act. At all times Mr. Kyle behaved as an all-around decent human being. I can only surmise that he was acting out of experiences he had as a child, experiences which he hid from his friends (and himself).

I hope that you and the sentencing judge will consider my perspective in this matter.

Regards,

Sam Michalowski

October 2, 2011

Charles Mabie
United States Probation Officer

c/o David M Bigeleisen
101 Howard St, Ste 310
San Francisco, CA  94105


Dear Mr Mabie,

I am writing on behalf of Dr. Kenneth Kyle.  I cannot speak in any way to what he stands accused of, as the perpetrator of these crimes is nothing of what I remember of my friend Ken.  I met in when we were both in graduate school at Arizona State University in the mid-to-late 1990s.  Since that time when we the opportunity arose we would meet and visit.  I most recently saw him in 2009 when I was in San Francisco for a conference.

Ken is a kind and funny man, concerned about community problems like homelessness, and a friend.  He made a "quick side trip" to see me, in far south Florida, as he was riding his motorcycle from Louisiana to Pennsylvania.  I'm sure most of us would not see 800 miles as a side trip, but he did.  He was a generous host when we last visited, showing me the sights of the city where he had found a sense of home.

It is hard to describe what a friend is and what Ken meant and means to me; I enjoyed his presence, I admired his intelligence, and I valued his giving spirit.  In turn, I felt valued and respected by him.  None of us want to be known and judged only for the worst things we've done.  My Ken was and is a good man and a good friend.  Please take this into account as you consider his case.  He has much left to give to our world.

Sincerely,

Judy Gibbons

3722 N. Loyola Drive,
#235
Kenner, LA 70065

Charles Mabie
United States Probation Office

Dear Mr. Mabie,

I appreciate this opportunity to speak to you on behalf of Kenneth Kyle.

I have known Kenny since the 1980's, when he was a close friend of my daughter at Loyola University in New Orleans. He sometimes visited us, and occasionally earned extra money when he was a student, assisting my husband in his downtown fur warehouse.

I was impressed by Kenny's academic achievements, and I kept tract of his rising career. I was shocked when I heard of his conviction because it was so out-of-character for the Kenny I knew and liked all those years.

I don't know what happened to Kenny. It's as if he somehow believed so intensely in his intellectual abilities to control his compulsions, that he didn't consider seeking the professional help he desperately needed. I think he has come to realize this. He seems to be motivated now to understand how and why he ended up where he is today.

I still believe the "old" Kenny, whom I've liked and admired for so long, still exists. For this reason, I hope you will consider giving him a lighter sentence, so that he may have a chance to not only atone for what he has done but to use his excellent writing skills to help others who may have experienced problems similar to his own.

Sincerely,

*Priscilla H. Kleinman*

Priscilla H. Kleinman

Wanda and Herbert Moreland
P.O. Box 691
El Dorado, AR 71731
September 5, 2011

Charles Mabie
United States Probation Office
c/o David Michael Bigeleisen
The Folger Building
101 Howard Street, Suite 310
San Francisco, California
Dear Mr. Mabie:

We are writing to you on behalf of Kenneth Kyle who is currently being evaluated by
your office for a sentencing recommendation.

Mr. Kyle is our nephew. I am his mother's sister. Kenneth had what I would consider to
be a very "normal" childhood. Ours was a closely knit family and we spent a great deal of
time with him and his family as he was growing up.

He always did very well in school and was a very loving and caring child. By nature he
was very thoughtful – the grandchild in the family who was conscientious about
communicating with his grandparents and visiting with them frequently.

Kenneth seemed to thrive in academia, working tirelessly to achieve his college degrees –
a great source of pride to his family.

He had a fascination with Asian cultures and spent time in Korea and Japan. Travel was
his passion. He was always planning his next trip, eager to visit new places and have new
experiences.

In recent years we have not had consistent and regular communication with Kenneth. As
with most families, distance and personal obligations kept us apart. Our last visit with
him was on the occasion of his father's funeral in April of 2009. He was certainly the
thoughtful, caring, respectful son at that time.

The family is totally devastated over what has purportedly occurred. There was certainly
no obvious exhibition of any deviant or aberrant behavior noted by us and he showed no
proclivity to it.

We have been communicating with him by letter since his incarceration. He tells us that
he has been doing some writing and trying to make productive and constructive use of his
time. He has also spoken of his psychiatric evaluation and treatment indicating that he

2

is pleased with his progress and optimistic about the success of the prescribed treatment.

We certainly do not understand or condone his actions and know that he must pay his debt to society. Our thoughts and prayers are with the victim as well as for Kenneth whom we hope will be rehabilitated and once again be a productive member of society.

Your consideration of this information will be deeply appreciated. Please advise if we can provide any additional information or be of further assistance.


Sincerely,

Wanda M. Moreland

Herbert L. Moreland Jr.

August 24, 2011

Mr. Charles Mabie
United States Probation Office

Dear Mr. Mabie:

I am writing to you on behalf of Kenneth Kyle. My name is Bernard Lafaso and I am Kenny's godfather. I have known Kenny all of his life. Kenny's father and I were college roommates and I have known the family for close to 50 years. I know the family values and morals are above reproach and I know Kenny was taught those values and morals.

Kenny was raised Catholic, but he drifted away from his faith in his adult years. Things that I do know about Kenny are that he is not a violent person or one to be easily angered. He makes friends easily and he is very intelligent. I think he can be trusted to do what he says he will do. That includes following trough with his counseling and taking all prescribed medicines. Things that I didn't know about Kenny is that he suffered from untreated depression. While that is not an excuse for his actions, it does give some explanation to his poor judgment in choosing this immoral behavior.

Since Kenny has been in jail he has seen a priest and has confessed his sins to God and has asked for God's forgiveness. Kenny understands all of the hurt he has caused for his family and friends. I do believe he is truly sorry for what he has done, not because he was caught but because now he understands the problems he has and that his behavioral habits need to be corrected and permanently changed.

I would like to share with you part of a letter he wrote to me at Christmas. He has no reason to deceive me, so what he tells me I do believe this is his true feelings.

"As for me my spirits are up. After quite a bit of experimentation the psychiatrist seems to have hit upon the right combination of drugs and dosages. I'm not medicated so to be out of it, but rather I feel more positive generally. As a life long pessimist and modern day, self-described Cassandra I can tell you it is very strange to not feel depressed and not feel that despair is in the wings just waiting to enter the stage were I to let my guard down. I fear I'd come to accept my depressed state and pessimistic disposition as just my fate, as normal. Accordingly, even when I had counseling which wasn't effective and missed the mark, I was all too ready to tell myself that's just the way it is. Similarly, when I tried medication before my arrest, I was all too prepared to accept its ineffectiveness. So, as I wrote this is strange ground for me. I wouldn't say I'm an optimist, but I'm not feeling pessimistic either. And it's a great relief to feel like I'm not responsible for carrying the whole world on my shoulders. With reflection and the help of my mental health counselor, I now see such unrealistic views to be underlying my madness. So to sum up, I'm feeling better even if my situation hasn't really changed."

I hope this letter sheds some light on helping you make your decision. I might add that because of his ability to communicate he might be able to help law-enforcement in dealing with pedophiles. Who else would have a better understanding of what is going trough their minds?

Sincerely,

*Bernard A. Lafaso*

Bernard A. Lafaso