1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
3  MIRANDA KANE (CABN 150630)
   Chief, Criminal Division
4  OWEN P. MARTIKAN  (CABN 177104)
   Assistant United States Attorney
5
       450 Golden Gate Ave., Box 36055
6      San Francisco, California 94102
       Telephone:  (415) 436-7200
7      Fax: (415) 436-7234
       E-Mail:  owen.martikan@usdoj.gov
8
9  Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,       )<br>                                 )<br>     Plaintiff,                  )<br>                                 )<br>     v.                          )<br>                                 )<br>KENNETH MARTIN KYLE,             )<br>                                 )<br>     Defendant.                  )<br>_____) | No.  CR 10-0245 JSW<br><br>THE UNITED STATES' SENTENCING MEMORANDUM<br><br><br>Date:  October 13, 2011<br>Time:   2:00 pm<br>Place:  Courtroom 11, 19th Floor |

**INTRODUCTION**

Defendant Kenneth Kyle comes before the Court for sentencing on his guilty plea, pursuant to a plea agreement, to one count of Aggravated Sexual Abuse with Children, in violation of 18 U.S.C. § 2241(c).  The parties agreed on an adjusted offense level of 39, although Probation has calculated an adjusted offense level of 41.  The agreed-upon Criminal History Category is I.  The parties agree that the proper sentence in this case, taking into account the factors set forth at 18 U.S.C. § 3553(a), is 360 months imprisonment, followed by ten years of supervised release.  Probation recommends a sentence of 405 months imprisonment, followed by lifetime supervised release.  The Probation recommendation is at the high end of the Guidelines

range as Probation has calculated it; the plea agreement recommendation is at the mid-range.

The United States recommends that the Court impose a custody term of 360 months in this case, followed by ten years on supervised release. This sentence is consistent with the sentencing guidelines and the sentencing facts set forth at 18 U.S.C. § 3553(a).

## STATEMENT OF FACTS

A.  The File-Sharing Lead.

Kenneth Kyle came to the FBI's attention through his use of peer-to-peer file sharing software to trade child pornography in December, 2009. An FBI agent in Virginia who was using similar software in an undercover capacity noticed that a user with the moniker "CruelSob" was sharing image and video files with titles indicative of child pornography. The agent downloaded 148 child pornography images and one video file containing child pornography from CruelSob's shared folder.

The FBI traced CruelSob's IP address from the file-trading session to a Comcast cable internet customer named Kenneth Kyle at 603 Natoma Street, Apt. 410 in San Francisco, California. The FBI passed this lead on to the San Francisco Police Department, which obtained a search warrant for this address on March 8, 2010, and executed it on March 10, 2010. San Francisco police officers seized several computers and computer peripherals, and learned from a roommate that Kyle was out of the country, apparently on business. San Francisco police officers also learned that Kyle was an assistant professor of public affairs and administration at California State East Bay University in Hayward.

FBI agents alerted Customs and Border Patrol (CBP) agents that Kyle was suspected of distributing and possessing child pornography, and that he might be returning to the United States in the near future. Based on this information, CBP agents flagged Kyle for a secondary inspection upon his return to the United States.

B.  The Airport Search.

On the afternoon of March 15, 2010, Kyle arrived at San Francisco International Airport aboard Lufthansa Flight No. 454 from Frankfurt, Germany. CBP officers directed Kyle to a secondary inspection. During this inspection, CBP officers examined Kyle's laptop and found

USA SENTENCING MEMO
CR 10-0245 JSW                                         2

several images of child pornography. ICE agents also examined some of the images, and agreed that they were child pornography. The images included photographs of infants and toddlers being sexually abused by adults. Kyle admitted to CBP officers that the laptop was his.

During the border search, CBP officers also searched Kyle's cell phone, and discovered a series of outgoing text messages to various numbers. A series of these messages were sent to a number with an area code in the St. Louis, Missouri, area to a recipient named Tessa Van Vlerah. The messages, sent from October through December, 2009, suggested that Kyle and Van Vlerah had a sexual relationship.

Because some of the texts suggested that Tessa might be a minor, by – for example – discussing her sneaking away from her "mum" to meet Kyle, ICE began to investigate Tessa's age. ICE located a Facebook page for "Tessa Van Vlerah" in St. Louis, Missouri, and printed it out for the case agent. The case agent noted that the woman pictured on the Facebook page, and the baby she was holding, were featured in some of the child pornography images on Kyle's laptop. ICE immediately contacted local law enforcement in St. Louis to have Tessa arrested, and to take the baby into protective custody.

        C.     <u>The Sexual Abuse of Tessa's Daughter.</u>

Kyle's computer contains several dozen images of graphic sex involving Tessa, her infant daughter, and an adult male whose face is not shown in the images. The infant is forced to orally copulate the adult male penis in several of these images. Kyle's laptop also contains a transcript of chats between an individual named "cruelsadisticbastard" and an individual named "thelmanlouise87." In these chats, which took place on February 10, 2010, "cruelsadisticbastard" discusses with "thelmanlouise87" his desire to have sex with Tessa's baby. ICE identified "cruelsadisticbastard" as Kyle based on a text message sent from Kyle's phone dated March 1, 2008 in which he tells someone to email pictures to him at the email address "cruelsadisticbastard@yahoo.com."

After local police had arrested Tessa, she gave Mirandized, recorded statements to ICE agents and local police. In the statements, Tessa acknowledged that she and Kyle had a sexual relationship that had lasted for about a year, that they had met in a fetish chat room relating to

pedophilia, and that she had Kyle had both molested her daughter and that Kyle had taken the pictures of the molestation that were on Kyle's laptop. Tessa described how Kyle had told Tessa that he loved her and that he was only sexually interested in her, and then had turned his sexual attention to the baby, who was born in February, 2009.

Tessa stated that Kyle would visit her every few months, that he would take her to a hotel room where they would have sex and molest the baby, and that he would photograph the abuse with a small red digital camera. Kyle apparently emailed pictures of the abuse to Tessa, but the United States has found no evidence that Kyle distributed the pictures to the world at large.

## THE UNITED STATES' SENTENCING RECOMMENDATION

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 245 (2005), this Court may consider any of the sentencing factors set forth in 18 U.S.C. § 3553(a) when imposing sentence, irrespective of the sentencing guidelines calculation applicable to the offense of conviction. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). These sentencing factors include the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to protect the public from further crimes of the defendant.

**I.    THE GUIDELINES CALCULATION.**

At the beginning of the sentencing process, the Court must properly calculate the sentencing guidelines range, based on the defendant's Criminal History Category and the guidelines applicable to the defendant's particular offense. In this case, the parties and Probation differ in their guidelines calculations by two levels, based on Probation's application of a cross-reference in the Sexual Abuse sentencing guideline at U.S.S.G. §2A3.1(c)(2). This reference requires use of the Child Pornography Production sentencing guideline at U.S.S.G. §2G2.1 if the sexual abuse was for the purpose of producing a visual depiction of the abuse, and the resulting offense level is higher than the offense level for sexual abuse. As Probation notes, although the base offense level for sexual abuse is higher than that for production of child pornography, the adjusted offense level for production of child pornography, because of the enhancements

applicable in this case, is two levels higher than the adjusted offense level for sexual abuse.

Because the cross-reference applies to the "resulting offense level" rather than the base or starting offense level, Probation appears to be correct in applying the child pornography production guideline. However, the custody sentence that the United States recommends is still in the middle of the higher guideline range. And for the reasons set forth below, the United States still recommends this sentence.

## II. APPLICATION OF THE STATUTORY SENTENCING FACTORS.

The statutory sentencing factors support the recommended 360-month sentence in this case. Two factors in particular – the nature of the offense and the need to protect the public – predominate and suggest that a lengthy sentence is necessary. A third factor – the characteristics of the defendant, namely his age at the beginning of this sentence – suggests some mitigation of this sentence.

The Court should impose a very lengthy sentence in this case. The defendant took part in the repeated sexual abuse of an infant, and photographed the abuse for his own sexual gratification and presumably for the sexual gratification of the infant's mother. The defendant also collected child pornography depicting similar sexual abuse of helpless children all over the world. His chat correspondence depicts a callous indifference to these children's suffering.

Under the plea agreement, Kyle will spend thirty years in prison and emerge as an elderly man. He will then be under supervised release until he is well into his 80s. The chance that Kyle will not survive this sentence is more than trivial. By the time Kyle emerges from prison, he will pose hardly any threat to the public at large. While it is not too uncommon to encounter elderly sex offenders who continue to break the law, it is very unlikely, in the United States' opinion, that Kyle would take this risk on supervised release after having spent more than half his adult life in prison. It is very unlikely that Kyle will survive a ten year term of supervised release, but if he does without incurring any violations, the United States believes that he could spend that last couple years of his life without supervision, and without posing a threat to anyone.

Also, by the time Kyle emerges from a thirty-year prison term, the victim in this case will be a grown woman. She will have had the opportunity to live out her childhood and her young

adult life with Kyle safely behind bars.  And by the time Kyle finishes his prison term, the victim will have had years to deal with the consequences of his abuse, and hopefully to overcome it.

Though the parties' recommended sentence in this case is in the heartland of even the higher sentencing guidelines calculation in the pre-sentence report, it is tempting to ask why an even longer sentence should not be imposed, given Kyle's abhorrent conduct.  When the perspective is from the beginning of a prison term, a 35- or 40-year sentence does not seem too severe when compared to a 30-year sentence, and perhaps all of them are close enough to a life sentence that the difference does not appear to matter all that much.  The difference, from the United States' perspective, is that a 30-year sentence – when imposed on a 47-year-old man – is a sufficiently long sentence that it serves the punitive, deterrent, and public safety goals of the Sentencing Reform Act while giving the defendant an incentive to change his ways, better his life, and perhaps do some good in the world that he would not have if the sentence amounted to a life sentence.

Finally, there are two aspects of the defendant's conviction in this case that deserve some mention, insofar as they may sway the Court in choosing between a 360-month sentence and a 405-month sentence.  As a precondition to his plea agreement, the defendant gave law enforcement a proffer about individuals whom he thought were or had abused children.  While this information did not lead to any arrests, the defendant offered the information with the knowledge that it would not affect the 360-month sentence that he had agreed to.  Also, the plea agreement waives the defendant's right to appeal the denial of his motion to suppress, which the United States does not believe had merit, but which was certainly not frivolous.

## CONCLUSION

The sentence in this case should be severe enough to ensure that the defendant spends most of the rest of his life in prison, but should offer the defendant some opportunity to prove that he can live a law-abiding life outside prison on supervised release.

The United States recommends, and respectfully requests, that the Court impose the sentence agreed to by the parties in the plea agreement in this case.

DATED: October 7, 2011                    Respectfully submitted,

MELINDA HAAG
United States Attorney

/s/
_____
OWEN P. MARTIKAN
Assistant United States Attorney