PAGES 1 - 36

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JEFFREY S. WHITE, JUDGE

UNITED STATES OF AMERICA,

|  |  |
|---|---|
| PLAINTIFF, | ) |
|  | ) |
| VS. | ) NO. CR 10-245 JSW |
|  | ) |
| KENNETH MARTIN KYLE, | ) |
|  | ) SAN FRANCISCO, CALIFORNIA |
| DEFENDANT. | ) WEDNESDAY |
|  | ) NOVEMBER 10, 2010 |
| _____ | ) 1:30 O'CLOCK P.M. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

FOR PLAINTIFF:          **OFFICE OF THE UNITED STATES ATTORNEY**
                        450 GOLDEN GATE AVE.
                        SAN FRANCISCO, CALIFORNIA  94102
                   BY:  **OWEN MARTIKAN,**
                        **ASSISTANT UNITED STATES ATTORNEY**

FOR DEFENDANT:          **DAVID MICHAEL BIGELEISEN, ESQUIRE**
                        101 HOWARD STREET
                        SAN FRANCISCO, CALIFORNIA 94105


*REPORTED BY:    KATHERINE WYATT, CSR 9866, RMR, RPR*
            *OFFICIAL REPORTER - US DISTRICT COURT*

**P R O C E E D I N G S**

NOVEMBER 10, 2010                         1:30 O'CLOCK P.M.

      THE CLERK:  CALLING CASE NUMBER CR-10-245, UNITED STATES VERSUS KENNETH MARTIN KYLE.

      COUNSEL, PLEASE STEP FORWARD AND STATE YOUR APPEARANCES.

      MR. MARTIKAN:  GOOD AFTERNOON, YOUR HONOR.  OWEN MARTIKAN FOR THE UNITED STATES.

      THE COURT:  GOOD AFTERNOON.

      MR. BIGELEISEN:  THANK YOU, YOUR HONOR. DAVID MICHAEL BIGELEISEN FOR MR. KYLE.

      THE COURT:  WELCOME.

      HELLO, MR. KYLE.

      THE DEFENDANT:  GOOD AFTERNOON.

      THE COURT:  YOUR CLIENT DOESN'T HAVE TO STAND NEXT TO YOU IF YOU DON'T WANT.  HE CAN SIT AT COUNSEL STABLE.

      MR. BIGELEISEN:  I'M QUITE COMFORTABLE WITH HIM STANDING NEXT TO ME.  HE WON'T HURT ANYONE.

      THE COURT:  THAT WASN'T THE IMPLICATION THAT HE WAS GOING TO HURT ANYBODY.

      MR. BIGELEISEN:  NO, THAT'S FINE.

      YOU MAY SIT DOWN IF YOU LIKE.

      THE COURT:  JUST A COURTESY TO YOUR CLIENT.  WE'RE GOING TO BE TALKING ABOUT LEGAL MATTERS.

1          BUT THAT'S FINE. STAY RIGHT THERE.

2          **MR. BIGELEISEN:**  OKAY.

3          **THE COURT:**  LET ME ASK FIRST, HAS THERE BEEN ANY

4    PROGRESS?  I NOTICE FROM THE GOVERNMENT'S RESPONSE AND THE REPLY

5    THAT THE PARTIES HAD BEEN MOVING TOGETHER, SO I WONDERED IF

6    THERE HAD BEEN ANY CHANGES VIS-A-VIS WHAT THE GOVERNMENT HAS

7    TURNED OVER OR WHAT THE DEFENDANT HAS DEMANDED.

8          I'LL START WITH YOU, MR. MARTIKAN.  ANY FURTHER

9    DEVELOPMENTS THAT I SHOULD KNOW ABOUT?

10          **MR. MARTIKAN:**  MAYBE TWO. I DON'T KNOW HOW

11   SIGNIFICANT THEY ARE IN TERMS OF THE DISPUTE. ONE IS THAT THERE

12   WAS -- ONE OF THE SEARCH WARRANTS WAS ACTUALLY A ROLLOVER SEARCH

13   WARRANT.  IT WAS THE FINAL ROLLOVER SEARCH WARRANT OF THE

14   DEFENDANT'S APARTMENT RELATING TO HIS COMPUTER, WHICH I DID NOT

15   HAVE A FILE STAMP.  MY AGENT DID NOT HAVE A FILE STAMPED COPY

16   OF.  SO I JUST PRODUCED ONE THAT WAS NOT FILE STAMPED.

17          MY INTENTION AT THE TIME WAS TO MOVE TO UNSEAL IT.

18   BUT THEN, WHEN I LOOKED AT IT I REALIZED I CAN'T REALLY MOVE TO

19   UNSEAL IT BECAUSE OF SOME OF THE INFORMATION THAT IS IN IT.  SO

20   INSTEAD I OBTAINED A COPY OF IT, WHICH I ACTUALLY HAVE, AND I'M

21   GOING TO PRODUCE IT.  I JUST HAD TO RUN IN HERE FROM OAKLAND, SO

22   I DIDN'T GET AN EXTRA COPY OF IT. THAT'S ONE ISSUE.

23          THE SECOND IS BY WAY OF EXPLANATION REGARDING DNA

24   ANALYSIS, WE HAD WAITED FOR SOMETIME TO GET A DNA SAMPLE FROM

25   THE VICTIM FROM MISSOURI -- FROM MISSOURI, LOCAL LAW ENFORCEMENT

1    IN MISSOURI. WE DID GET THAT.

2              NOW, THE ISSUE IS, FRANKLY, COMING UP WITH THE MONEY

3    TO TEST IT. THE AGENCY HAS BEEN TOLD THEY DON'T HAVE THAT MONEY.

4    AND SO WE'RE TRYING TO FIND THAT IN OTHER WAYS.  SO IT'S NOT AS

5    IF THERE'S SOME DELAY IN A LAB. IT'S REALLY COMING UP WITH THE

6    MONEY IN ORDER TO TEST IT.

7              SO THERE'S NOT ANYTHING THAT HAS BEEN DONE THAT IS

8    BEING WITHHELD.

9              **THE COURT:**  IS THIS FROM THE FEDERAL GOVERNMENT

10   COMING UP WITH THE MONEY?

11             **MR. MARTIKAN:**  YES.  I MEAN, I'M SURE THE FEDERAL

12   GOVERNMENT AT LARGE HAS THE MONEY.  IT'S JUST THE AGENCY, THE

13   PROSECUTING AGENCY HERE, ICE, THE INVESTIGATING AGENCY DOES NOT

14   HAVE THE MONEY.  THEY WILL NOT --

15             **THE COURT:**  HOW ABOUT THE FBI?

16             **MR. MARTIKAN:**  WE'RE HUNTING FOR THAT AS ONE SOURCE

17   THAT WE'RE HUNTING FROM.

18             **THE COURT:**  ALL RIGHT.  ANYTHING THAT YOU WOULD LIKE

19   TO SAY ABOUT THOSE, WHAT MR. MARTIKAN JUST SAID?

20             **MR. BIGELEISEN:**  WELL, AS FAR AS THE DNA IS

21   CONCERNED, I THINK THAT THE QUESTION I'D LIKE TO ASK THE

22   GOVERNMENT THROUGH THE COURT IS EITHER WHEN WILL THEY HAVE THE

23   RESULTS?  OR SHORT OF THAT, WHEN WILL THEY KNOW WHEN THEY WILL

24   HAVE THE RESULTS?

25             **THE COURT:**  WELL, IT SOUNDS LIKE THEY MAY NEVER HAVE

1    THE RESULTS.  BUT I THINK THE SECOND ONE IS WHEN ARE -- I GUESS

2    I'LL PUT THE QUESTION A DIFFERENT WAY, MR. MARTIKAN.

3              WHEN WILL YOU KNOW WHETHER THE MONEY TO TEST THE DNA

4    CAN BE FOUND?  AND THEN, THE NEXT QUESTION WILL BE:  FROM THAT

5    TIME, HOW LONG WOULD IT TAKE TO DO THE DNA TEST?

6              **MR. MARTIKAN:**  I WOULD SAY THAT WE WILL HAVE THE

7    MONEY ISSUE RESOLVED THIS MONTH. AS FAR AS GETTING THE RESULTS

8    DONE THAT SHOULD ACTUALLY BE FAIRLY QUICK BECAUSE WE'RE GOING TO

9    HAVE TO PAY A LOT OF MONEY TO HAVE IT DONE QUICKLY.

10             **THE COURT:**  RIGHT.

11             **MR. MARTIKAN:**  SO THAT WILL PROBABLY BE TWO WEEKS,

12   YOU KNOW, AFTER THE MONEY IS --

13             **THE COURT:**  I'M JUST A LITTLE SURPRISED THAT THE FBI

14   WITH THE RESOURCES, AND THE FBI WAS THE LEAD AGENCY IN THIS

15   CASE, OR AT LEAST A SIGNIFICANT PART OF IT, DOESN'T HAVE A LAB

16   IN PLACE THAT CAN TEST DNA.

17             **MR. MARTIKAN:**  RIGHT. AND WELL --

18             **THE COURT:**  ESPECIALLY BECAUSE THERE'S A STATUTE NOW

19   THAT WE BOTH KNOW, BECAUSE IT'S IN EVERY PLEA AGREEMENT, THAT

20   PROVIDES A DEFENDANT WITH A RIGHT TO HAVE A DNA TEST TO PROVE

21   ACTUAL INNOCENCE AFTER THE CASE IS CONCLUDED.

22             **MR. MARTIKAN:**  CORRECT.

23             **THE COURT:**  SO YOU WOULD THINK THAT THERE WOULD BE

24   THE RESOURCES TO COMPLY WITH THAT STATUTE.

25             **MR. MARTIKAN:**  I THINK SO. THE ISSUE WAS -- REALLY

1  BEGAN WITH ICE. ICE IS THE MAIN INVESTIGATING AGENCY. THEY ARE

2  THE ONES THAT SUDDENLY COULD NOT COME UP WITH THIS MONEY.

3  SO I THINK WE MIGHT GET -- WE ARE GOING TO GET THE

4  MONEY, AND IT PROBABLY WILL COME FROM THE FBI. IF NOT, IT WILL

5  COME FROM SOMEWHERE.

6  **THE COURT:** ALL RIGHT. AND THEN, SO YOUR THINKING

7  SOMETIME BY NO LATER THAN THE MIDDLE OF DECEMBER YOU'LL HAVE THE

8  RESULTS OF ANY DNA TEST?

9  **MR. MARTIKAN:** YES, I THINK THAT'S FAIR ENOUGH.

10  **THE COURT:** ALL RIGHT.  SO I'M GOING TO ORDER THAT

11  NOW, HOLD THE GOVERNMENT -- AND THAT WILL GIVE YOU SOME LEVERAGE

12  WITH YOUR AGENCIES.

13  SO, MS. OTTOLINI, LET'S PICK A DATE AT RANDOM IN

14  MID-DECEMBER.

15  **THE CLERK:** DECEMBER 17TH.

16  **THE COURT:** WILL BE THE LAST DAY TO TURN OVER TO THE

17  DEFENDANT RESULTS OF DNA TESTS, ANY DNA TESTS DONE IN THIS CASE

18  THAT'S RELEVANT.

19  **MR. MARTIKAN:** THANK YOU, YOUR HONOR.

20  **THE COURT:** WHICH IS RELEVANT, WHICH WOULD BE PRETTY

21  MUCH ANY TEST THAT IS DONE.

22  ALL RIGHT.  IS THAT SATISFY TO YOU, COUNSEL?

23  **MR. BIGELEISEN:** YES.  THAT'S FINE.

24  **THE COURT:** NOW, LET ME MOVE ON TO THE MOTION. THE

25  FIRST ISSUE -- I'VE TRIED TO BOIL THIS DOWN TO WHAT IS BEING

1  STILL AT ISSUE HERE.  AND THERE MAY BE OTHER THINGS THAT I HAVE

2  MISSED.  BUT I THINK I'VE BOILED IT DOWN PRETTY WELL FROM THE

3  PAPERS.

4          THE FIRST IS THE IDENTITY OF THE -- THE IDENTITY OF

5  THE AGENTS WHO CONDUCTED THE INVESTIGATION. AND THE GOVERNMENT

6  IN ITS OPPOSITION STATES THAT THE IDENTITY OF THE AGENTS WHO

7  HAVE CONDUCTED THE INVESTIGATION HAVE BEEN DISCLOSED, EVEN ONE

8  INADVERTENTLY.  ONE WHO PROBABLY THE GOVERNMENT DIDN'T INTEND TO

9  DISCLOSE. AND THAT IT IS ONLY HOLDING CODE NAMES OF OTHER AGENTS

10  TO AVOID JEOPARDIZING ONGOING INVESTIGATIONS.

11          IS THAT STILL THE GOVERNMENT'S POSITION?

12          **MR. MARTIKAN:**  VERY CLOSE TO THAT, YOUR HONOR. THE

13  AGENTS' IDENTITY THAT IT'S MY UNDERSTANDING THE DEFENDANT IS

14  ASKING FOR WAS DISCLOSED INADVERTENTLY, I THINK AT PROBABLY THE

15  VERY, VERY BEGINNING OF THE CASE. AND AS WAS DISCLOSED THE

16  UNDERCOVER CODE NAME THAT THAT AGENT WAS DOING -- WAS USING,

17  WHICH IS ACTUALLY PROBABLY THE MORE SIGNIFICANT ISSUE FOR THE

18  GOVERNMENT.

19          SO THAT'S ACTUALLY IN DEFENSE COUNSEL'S POSSESSION.

20  AND WE'VE DISCUSSED ENTERING INTO A STIPULATED PROTECTIVE ORDER

21  TO PROTECT THAT, AND THAT HAS BEEN DONE.

22          I MEAN, THE PROTECTIVE ORDER HASN'T BEEN DONE, BUT

23  THE DISCLOSURE HAS BEEN DONE.

24          THERE WAS ANOTHER UNDERCOVER AGENT IN ANOTHER OFFICE

25  WHO ALSO FOUND A LEAD USING A DIFFERENT CODE NAME WITH THE SAME

1  DEFENDANT. THAT LEAD WAS NOT CHARGED. IT HAS NOT BE CHARGED YET

2  IN THIS CASE.

3          **THE COURT:**  WHEN YOU SAY "THE LEAD HASN'T BEEN

4  CHARGED," YOU MEAN THAT THE INFORMATION RESULTING FROM THE

5  LEAD?

6          **MR. MARTIKAN:**  EXACTLY. IT'S PASSED ON, BUT IT HASN'T

7  RESULTED -- IT'S NOT THE SUBJECT OF A CHARGE PENDING IN THIS

8  CASE.

9          AND IT'S MY UNDERSTANDING THE DEFENSE IS NOT SO

10  INTERESTED IN THAT INFORMATION. IF THEY ARE, I WOULD BE WILLING

11  TO PROVIDE THE AGENT'S NAME SUBJECT TO THAT SAME PROTECTIVE

12  ORDER, BUT I WOULD NOT BE WILLING TO PROVIDE THE CODE NAME.

13          **THE COURT:**  OKAY. SO WITH OR WITHOUT THAT NAME,

14  DEPENDING UPON WHAT THE DEFENDANT'S POSITION IS, THE GOVERNMENT

15  WILL HAVE PROVIDED WITH THAT ONE POSSIBLE EXCEPTION -- IT MAY

16  NOT BE AN EXCEPTION -- ALL OF THE IDENTITIES, THE NAMES OF THE

17  AGENTS, CORRECT?

18          **MR. MARTIKAN:**  YES, YOUR HONOR.

19          **THE COURT:**  ALL RIGHT.  WHAT'S THE DEFENDANT'S

20  POSITION?  IT SOUNDS LIKE YOU ARE GETTING WHAT YOU WANT EXCEPT

21  POSSIBLY FOR ALL OF THE CODE NAMES BECAUSE THERE'S A CODE --

22  THERE'S ONE CODED AGENT, IF YOU WILL, WHOSE INFORMATION MAY NOT

23  BE RELEVANT TO THE INVESTIGATION.

24          **MR. BIGELEISEN:**  YOUR HONOR, I REREAD THE DISCLOSURE

25  WHICH THE GOVERNMENT GAVE ME.  AND AS I REREAD IT, IT APPEARS TO

1   ME THAT THERE'S A CODE NAME FOR THE AGENT THAT IS INVESTIGATING,

2   BUT NOT THE AGENT'S IDENTITY ITSELF.

3          IF I'M MISTAKEN, I APOLOGIZE. BUT IT APPEARS THAT THE

4   GOVERNMENT DOESN'T OBJECT TO PROVIDING THAT. AND BEFORE YOU TOOK

5   THE BENCH MR. MARTIKAN AND I SPOKE, AND I SAID THAT I ONLY WANT

6   THAT INFORMATION FOR THE PURPOSE OF THIS CASE, AND THAT I'D BE

7   HAPPY TO MEET AND CONFER WITH HIM ABOUT A PROTECTIVE ORDER, IF

8   THAT'S APPROPRIATE.

9          **THE COURT:**  WELL, SOUNDS LIKE, THOUGH -- I MEAN,

10  SOMETIMES THE DEVIL'S IN THE DETAILS.  BUT I DON'T THINK THAT'S

11  THE CASE HERE. I THINK WE HAVE AN AGREEMENT.

12         THE GOVERNMENT IS WILLING TO PROVIDE THE NAMES OF ALL

13  THE AGENTS. YOU ALREADY HAVE THE CODE NAME OF THE ONE THAT

14  ACTUALLY RESULTED IN SOME OF THE CHARGES HERE.

15         SO THE GOVERNMENT IS AGREEING TO DO SO. I EXPECT THE

16  GOVERNMENT -- JUST A MATTER OF MAYBE LOGISTICS, MAYBE -- BECAUSE

17  I HAPPEN -- IN REVIEWING THE MATERIALS SUBMITTED BY THE PARTIES

18  I SAW BOTH THE NAME AND THE CODE NAME OF THE AGENT INVOLVED

19  HERE.

20         SO I HAVE IT IN MY MATERIALS. IF YOU DON'T, MR.

21  MARTIKAN, YOU ARE WILLING TO GIVE IT TO THE DEFENDANT, RIGHT?

22         **MR. MARTIKAN:**  I'LL POINT IT OUT TO HIM, YES, YOUR

23  HONOR.

24         **THE COURT:**  RIGHT. AND WITH RESPECT TO THIS UNNAMED

25  CODED NAMED AGENT, WHICH HAS NOT RESULTED IN ANY CHARGES, I

1   ASSUME YOU'RE WILLING TO FORGO THAT, AT LEAST AT THIS TIME?

2           **MR. BIGELEISEN:**  I BELIEVE THE GOVERNMENT'S WILLING

3   TO GIVE ME THE NAME.  AND AS FAR AS THE CODE NAME IS CONCERNED

4   WHY DON'T WE CROSS THAT BRIDGE WHEN WE COME TO IT?

5           **THE COURT:**  ALL RIGHT.  SO YOU'LL GIVE COUNSEL THE

6   NAME?

7           **MR. MARTIKAN:**  YES, YOUR HONOR.

8           **THE COURT:**  GREAT.  SO THAT WILL PRETTY MUCH RESOLVE

9   FOR THE MOMENT AT LEAST THAT, THE IDENTITY OF AGENTS AND CODE

10  NAMES OF AGENTS WHO CONDUCTED THE INVESTIGATION.

11          THE NEXT LARGE CATEGORY IS THE -- HAS TO DO WITH THE

12  INVESTIGATION IN MISSOURI. IT'S NOT CLEAR TO THE COURT LOOKING

13  AT THE PAPERS WHAT THE DEFENDANT IS SEEKING.

14          I READ, YOU KNOW, THE GOVERNMENT'S ANALYSIS OF THE

15  U.S. VERSUS FORT, F-O-R-T, CASE, AND THE DEFENDANT'S RELIANCE ON

16  THIS COURT, JUDGE ALSUP'S DECISION IN THE CERNA, C-E-R-N-A, CASE

17  ADDRESSING THE SCOPE OF THE GOVERNMENT'S OBLIGATION TO OBTAIN

18  AND DISCLOSE BRADY MATERIALS FROM STATE AND LOCAL AGENCIES.

19          SO I'D LIKE TO GET BETTER CLARIFICATION, STARTING

20  FROM THE DEFENDANT AS THE REQUESTING PARTY, AS TO EXACTLY WHAT

21  HE WANTS, WHAT'S AT ISSUE AND WHAT THE GOVERNMENT IS --

22  GOVERNMENT'S POSITION WITH RESPECT TO ITS BRADY OBLIGATIONS IN

23  LIGHT OF WHAT THE DEFENDANT WANTS, SO --

24          **MR. BIGELEISEN:**  OKAY. WELL, THERE ARE TWO PRONGS FOR

25  SEEKING THE MATERIAL THAT'S IN MISSOURI. ONE IS TO THE EXTENT

1 THAT IT'S INFORMATION THAT THE GOVERNMENT IS GOING TO RELY ON IN

2 ITS CASE-IN-CHIEF THAT FALLS UNDER RULE 16.  OR IF IT'S HELPFUL

3 TO THE DEFENSE.

4          IN A MORE POINTED WAY, I'M SURE THAT THE COURT'S

5 DETECTED IMMEDIATELY THAT MOST OF OUR MOTION IS DIRECTED TOWARD

6 A MOTION TO SUPPRESS, WHICH WE CONTEMPLATE, AND AN INVENTORY OF

7 THAT WHICH IS TO BE SUPPRESSED WILL BE HELPFUL, IF SUCH IS TO BE

8 PRESENTED.

9          SO THAT IS -- THAT IS THE THINKING OF IT. THE

10 THINKING CONCERN, OF COURSE, IS WORTH EXAMINING.  AND IT APPEARS

11 AS THOUGH AT LEAST A LOT OF IT WAS A JOINT PROJECT BETWEEN THE

12 FEDERAL AGENTS AND THE MISSOURI PEOPLE.

13          AND SO I THINK IT'S AVAILABLE TO THE GOVERNMENT, AND

14 ALL THEY NEED TO DO IS ASK FOR IT AND GIVE IT TO US.

15          **THE COURT:**  WELL, ISSUE IS REALLY GOING TO BE -- AND

16 I GUESS I'LL ASK YOU, MR. MARTIKAN:  WHAT IS THE "IT" THAT WE'RE

17 TALKING ABOUT?

18          SO I GUESS I SHOULD SAY BECAUSE IT SEEMED TO THE

19 COURT THAT THIS INVESTIGATION WAS -- YOU KNOW, THE COURSE OF THE

20 INVESTIGATION IS PRETTY TRANSPARENT.  THIS IS NOT LIKE A -- THIS

21 IS NOT LIKE AN MS13 CASE WHERE THERE'S SO MANY TENTACLES.

22          THIS IS A CASE THAT IS VERY LINEAR IN TERMS OF

23 VARIOUS  -- THE CHATTING ON LINE FOLLOWED BY THE WARRANT,

24 FOLLOWED BY THE SAN FRANCISCO POLICE, FOLLOWED BY THE BORDER

25 SEARCH, FOLLOWED BY THE INVESTIGATION IN MISSOURI, THE LOCATION

1    OF THE WOMAN AND THE CHILD IN MISSOURI, AND THEIR INVESTIGATION

2    AND CHARGES.

3            IT SEEMS PRETTY TRANSPARENT TO THE COURT.  SO I GUESS

4    I'LL ASK IN KIND OF A SORT OF A VERNACULAR WAY OF THE

5    GOVERNMENT:  DO YOU HAVE ANY IDEA WHAT THE DEFENDANT IS TALKING

6    ABOUT?  WHAT HAVE YOU NOT TURNED OVER THAT YOU KNOW OF?

7            AND THEN, THE NEXT QUESTION WOULD BE:  CAN YOU OBTAIN

8    IT, AND WOULD YOU BE WILLING TO TURN IT OVER?

9            **MR. MARTIKAN:**  OKAY. TO ANSWER THE FIRST QUESTION, WE

10   HAVE NOTHING HAS NOT BEEN TURNED OVER. WE'VE TURNED OVER ALL THE

11   REPORTS THAT WE RECEIVED FROM MISSOURI IN REDACTED FORM.  BUT

12   PURELY TO TAKE OUT VICTIMS AND INNOCENT WITNESSES' IDENTIFIERS

13   AND LOCATION, CONTACT INFORMATION.

14           SO THAT'S THE SHORT ANSWER. AS FAR AS --

15           **THE COURT:**  AND THE FRUITS OF THE IDENTITY OF OR THE

16   ACCESS TO THE FRUITS OF ALL OF THE RELEVANT SEARCHES?

17           **MR. MARTIKAN:**  YES. NOW, TO DISCUSS A LITTLE BIT HOW

18   THIS INVESTIGATION TURNED INTO THE PARALLEL MISSOURI

19   INVESTIGATION -- AND THIS WAS A LEAD.  THE LEAD TO THE VICTIM IN

20   MISSOURI WAS A LEAD THAT WAS DEVELOPED HERE.

21           WE SIMPLY CONTACTED MISSOURI LAW ENFORCEMENT TO GET

22   THE KID OUT OF THE SITUATION AS QUICKLY AS POSSIBLE. THAT IS

23   WHERE THE -- I WON'T SAY THAT'S WHERE THE COOPERATION ENDED, BUT

24   THERE WAS -- THERE'S NO JOINT INVESTIGATION. THEY SIMPLY WENT

25   THEIR WAY WITH THEIR INVESTIGATION, AND WE TRIED TO COOPERATE

1   WITH THEM, AND WE'VE GOTTEN SOME COOPERATION.

2          BUT WHAT OTHER INFORMATION THEY HAVE THAT WE DON'T

3   KNOW ABOUT --

4          **THE COURT:**  WELL, FOR EXAMPLE, YOU JUST MENTIONED

5   SOMETHING THAT APPARENTLY DNA OF THE CHILD VICTIM WAS TAKEN.

6          **MR. MARTIKAN:**  YES.

7          **THE COURT:**  SO CLEARLY THAT'S AN ELEMENT OF THE

8   MISSOURI INVESTIGATION THAT THE GOVERNMENT INTENDS TO RELY UPON

9   IF IT -- AND, YOU KNOW, TO THE EXTENT THAT IT WERE -- IT PROVED

10  TO BE ANYTHING OTHER THAN A POSITIVE, IT MIGHT POSSIBLY BE BRADY

11  MATERIAL.

12         **MR. MARTIKAN:**  CORRECT. AND WE HAVE NO ISSUE WITH

13  PROVIDING THE RESULTS OF THAT EITHER WAY TO THE DEFENSE. I THINK

14  THAT'S -- FROM THE GET-GO THAT HAS NOT BEEN OUR POINT OF

15  CONTENTION, THE DNA.

16         **THE COURT:**  SO YOUR REPRESENTING TO THE COURT THAT

17  YOU'RE NOT AWARE OF ANY INFORMATION DEVELOPED DURING THE

18  MISSOURI INVESTIGATION THAT HAS NOT BEEN -- THAT YOU HAVE NOT

19  TURNED OVER TO THE DEFENDANT?

20         **MR. MARTIKAN:**  CORRECT. THE ONLY ISSUE THAT -- THE

21  ONLY REMAINING ISSUE, REALLY, YOUR HONOR, IS WHETHER THE OTHER

22  DEFENDANT TESTIFIES AS A WITNESS IN THIS CASE.  AND ALL THE

23  JENCKS, FRANKLY, FOR THAT HAS ACTUALLY BEEN TURNED OVER. SO I

24  DON'T THINK THERE IS ANYTHING LEFT.

25         **THE COURT:**  SO AS A MATTER OF -- LET'S SAY A MATTER

1    OF LAW, WHAT'S THE GOVERNMENT'S POSITION WITH RESPECT TO THE

2    SCOPE OF YOUR -- OF THE GOVERNMENT'S BRADY OBLIGATIONS WITH

3    REGARD TO THE MISSOURI INVESTIGATION?

4            **MR. MARTIKAN:**  AS A MATTER OF LAW -- AND BY "MISSOURI

5    INVESTIGATION," YOUR HONOR, WE REFER -- I'M REFERRING TO THE

6    LOCAL LAW ENFORCEMENT INVESTIGATION.

7            CLEARLY, AS FAR AS THE FEDERAL INVESTIGATION IN

8    MISSOURI, WE'RE ALL PART OF THE SAME FAMILY.

9            **THE COURT:**  LET'S SAY HYPOTHETICALLY, FOR EXAMPLE,

10   THE LOCAL -- THIS WILL BE A VERY CRISP POINT.  THE LOCALS

11   INTERVIEWED THIS WOMAN WHOSE DAUGHTER WAS THE VICTIM.

12           AND LET'S ASSUME THE LOCAL AUTHORITIES INTERVIEWED

13   HER, AND SHE MADE SOME -- JUST MAKING IT UP.  THERE'S NOTHING IN

14   THE PAPERS TO SUGGEST THIS -- BUT LET'S SAY SHE MADE AN

15   EXCULPATORY OR INCONSISTENT STATEMENT.

16           TECHNICALLY PART OF THE LOCAL INVESTIGATION, WOULD

17   YOU VIEW THAT AS YOUR OBLIGATION TO ASK THE AUTHORITIES FOR SUCH

18   INFORMATION UNDER BRADY?

19           **MR. MARTIKAN:**  AS A LEGAL MATTER, NO. I WOULD NOT.

20           **THE COURT:**  ALL RIGHT. NOW, AS A PRACTICAL MATTER?

21           **MR. MARTIKAN:**  AS A PRACTICAL MATTER, WE ARE ALREADY

22   ASKING THEM FOR EVERYTHING. AND WHAT WE LEARN ABOUT AND OBTAIN

23   FROM THEM I CONSIDER, EVEN THOUGH I ACTUALLY DON'T KNOW AS A

24   TECHNICAL MATTER THIS IS TRUE,  I CONSIDER IT PART OF OUR

25   DISCOVERY OBLIGATION TO GO THROUGH ANYTHING WE GET FROM THEM FOR

1    BRADY OR OTHER DISCOVERABLE MATERIAL.

2             **THE COURT:**  WELL, COUNSEL, MY TENTATIVE VIEW ON THIS

3    GIVEN THE STATE OF THIS RECORD AND THE REPRESENTATIONS AND

4    ARGUMENTS IS TO DENY THE REQUEST WITHOUT PREJUDICE TO A MORE

5    SPECIFIC SHOWING FROM THE DEFENDANT AS TO WHAT IS REALLY AT

6    ISSUE AND WHAT HE REALLY WANTS THAT HE HAS REASON TO BELIEVE THE

7    GOVERNMENT HAS.

8             THE GOVERNMENT'S REPRESENTED THEY HAVE TURNED OVER

9    EVERYTHING THEY HAVE. THEY KNOW OF NOTHING ELSE, AND THEY HAVE

10   EVEN SAID THAT TO THE EXTENT THAT THEY COME INTO CONTACT FROM

11   LOCAL SOURCES TO MATERIAL THAT WOULD BE OTHERWISE DISCOVERABLE

12   THEY ARE GOING TO TURN IT OVER TO YOU.

13            SO I DON'T KNOW THERE'S ANYTHING MORE THE COURT CAN

14   DO AT THIS POINT OTHER THAN TO SAY DENY THE REQUEST WITHOUT

15   PREJUDICE.  AS EVENTS ON THE GROUND UNFOLD, AS IT WERE, YOU CAN

16   ASK THE GOVERNMENT, AND IF THEY WON'T GIVE IT TO YOU THEN YOU

17   CAN COME BACK TO THE COURT.

18            IS THAT ACCEPTABLE?

19            **MR. BIGELEISEN:**  WELL, THE ANSWER IS "YES," BUT MAY I

20   REMARK?

21            **THE COURT:**  OF COURSE.

22            **MR. BIGELEISEN:**  AND THAT IS THAT WHAT WE'RE ASKING

23   THE GOVERNMENT FOR IS THAT WHICH WE DON'T KNOW EXISTS OR DOESN'T

24   EXIST, BUT WHICH WE SUSPECT HAS BEEN DONE IN MISSOURI THAT THE

25   GOVERNMENT DOESN'T KNOW ABOUT. AND THAT'S -- AND SO IT'S

```
 1   DIFFICULT FOR ME TO SPECIFY WHAT THAT IS TO THE COURT TODAY.

 2             AND SO I SUPPOSE THAT IN ANOTHER WAY THIS APPLICATION

 3   TO THE COURT IS IN THE FORM OF AN INQUIRY TO THE GOVERNMENT

 4   SAYING:

 5             "PLEASE ASK THE PEOPLE IN MISSOURI FOR WHAT THEY HAVE

 6             AND THEN GIVE IT TO US."

 7             THE COURT:  ALL RIGHT.  WHAT INQUIRIES HAVE YOU MADE

 8   VIS-A-VIS IN GENERAL TERMS OF THE AUTHORITIES FOR INFORMATION

 9   THAT MIGHT ADDUCE SOMETHING TO WHICH THE DEFENDANT UNDER YOUR

10   RUBRIC MIGHT BE ENTITLED?

11             MR. MARTIKAN:  WELL, YOUR HONOR, WE ARE -- AND THIS

12   HAS BEEN AN ONGOING PROCESS -- WE'RE TRYING TO GET EVERYTHING WE

13   CAN FROM THEM.  AND, OBVIOUSLY, WE WILL SHARE WHAT WE HAVE WITH

14   THEM. SO -- AND THAT'S NOT JUST FOR PURPOSES OF MAKING A BRADY

15   INQUIRY.  THAT'S FOR HELPING OUR CASE.

16             SO THAT'S AN ONGOING PROCESS. WE UNDERSTAND, YOU

17   KNOW, THEY HAVE ANOTHER DEFENDANT OVER THERE. THEY HAVE A

18   VICTIM.  AND SO WE ARE LOOKING FOR ANYTHING THEY HAVE. I DON'T

19   KNOW THAT WE -- I DON'T HAVE A SUSPICION THAT THEY ARE

20   CONCEALING SOMETHING FROM US OR THAT THERE'S SOMETHING THAT WE

21   DON'T KNOW ABOUT THAT THEY HAVE.

22             THE COURT:  IS THIS DEFENDANT CHARGED IN MISSOURI?

23             MR. MARTIKAN:  YES.

24             THE COURT:  AND ARE YOU IN CONTACT WITH THE DEFENSE

25   ATTORNEY IN MISSOURI?
```

1          **MR. BIGELEISEN:**  I HAVE NOT BEEN ABLE TO REACH THE

2    DEFENSE ATTORNEY.  I'VE PLACED SOME PHONE CALLS TO HIS OFFICE.

3    I HAVE SPOKEN WITH THE PROSECUTOR.

4          **THE COURT:**  OKAY.  WELL, I THINK IT WOULD BE --

5    SOUNDS LIKE YOU HAVE A PIPELINE TO BOTH SIDES, AS THE GOVERNMENT

6    DOES. SO I'M GOING TO DENY THIS REQUEST WITHOUT PREJUDICE.

7          IF, AS YOUR INVESTIGATION GOES ALONG -- AND, AGAIN,

8    YOU'RE NOT DOING THIS BLINDLY, COUNSEL.  YOU ARE SPEAKING TO THE

9    RIGHT PEOPLE AND DOING AN EFFECTIVE JOB IN DOING SO.  IF YOU

10   COME UP WITH SOMETHING -- IF THEY GO:

11          "OH, YEAH.  AND, BY THE WAY, THERE'S THIS OTHER

12          INFORMANT OUT THERE WHO LED US TO THIS DEFENDANT," OR

13   WHATEVER, YOU CAN CERTAINLY HAVE A DIALOGUE WITH MR. MARTIKAN,

14   AND IF YOU'RE NOT SATISFIED COME BACK TO THE COURT.

15          **MR. BIGELEISEN:**  THANK YOU.

16          **THE COURT:**  I'M NOT GOING TO PUT A DEADLINE ON THAT,

17   PER SE, BECAUSE AS FAR AS I KNOW NOW THE MATTER, UNTIL SOMEBODY

18   OPENS IT AGAIN, IS CLOSED.  AND THE INVESTIGATION IS GOING TO

19   CONTINUE.  AND I'M NOT SURE WHAT, IF ANYTHING, WILL COME UP THAT

20   WILL BE IN DISPUTE.

21          IT SOUNDS LIKE IT WON'T BE IN DISPUTE BECAUSE THE

22   GOVERNMENT WANTS TO GET AS MUCH AS IT CAN.  AND THEY HAVE AGREED

23   TO GIVE YOU WHATEVER THEY CAN GIVE YOU.  SO I'M NOT GOING TO GO

24   ANY FURTHER WITH THAT.

25          SO WITH RESPECT TO -- WE'VE DEALT WITH THE DNA. THE

1    NEXT QUESTION, GENERAL DEMAND OR REQUEST THAT THE DEFENDANT HAS

2    MADE IS INFORMATION CONCERNING THE SEARCH AT SAN FRANCISCO

3    INTERNATIONAL AIRPORT OF THE DEFENDANT'S COMPUTER AND CELL PHONE

4    AND THE LIKE.

5              AND THE DEFENDANT IS ASKING FOR -- THEY WANT TO KNOW

6    WHAT THE INFORMATION WAS THAT THE ICE OFFICIALS HAD AT THE TIME

7    THEY CONDUCTED THEIR SEARCH.  AND DEFENDANT CLAIMS THAT THIS

8    INFORMATION IS NECESSARY TO PREPARE A MOTION TO SUPPRESS.

9              SO MY QUESTION IS, COUNSEL:  IT'S CORRECT THAT YOU

10   AGREE, AND THE PAPERS SEEM TO INDICATE, THAT THIS SEARCH TOOK

11   PLACE AT THE BORDER OR THE FUNCTIONAL EQUIVALENT OF A BORDER,

12   CORRECT?

13             **MR. BIGELEISEN:**  AT LEAST SOME OF IT DID, YES. YES.

14   THAT'S CORRECT.

15             **THE COURT:**  WHICH PART DIDN'T?

16             **MR. BIGELEISEN:**  I BELIEVE THAT -- OKAY. LET ME PAUSE

17   TO BE COMPLETE. PLEASE FORGIVE ME.

18             MY IMPRESSION IS THAT THE ICE OFFICIALS SEARCHED THE

19   CELL PHONE AT THE BORDER. THAT'S MY IMPRESSION.  OR SHORTLY

20   AFTERWARD.

21             I BELIEVE THAT THEY SEARCHED THE COMPUTER AT THE

22   BORDER, AND THEN AT ANOTHER TIME AFTERWARD, AS WELL.

23             **THE COURT:**  ALL RIGHT.

24             **MR. BIGELEISEN:**  THAT'S MY IMPRESSION FROM WHAT I

25   HAVE SO FAR.

1  **THE COURT:**  ALL RIGHT.  MR. MARTIKAN, DO YOU HAVE ANY

2  INFORMATION ABOUT THE SUCCESSION OF SEARCHES?

3  **MR. MARTIKAN:**  I DO, YOUR HONOR.  THE PHONE AND

4  LAPTOP WERE BOTH INITIALLY SEARCHED AT THE BORDER.  AND REPORTS

5  OF THE SEARCHES OF THOSE WERE CREATED FOUR DAYS LATER. SO THERE

6  WERE INITIAL SEARCHES FOR CONTRABAND AT THE BORDER.  AND THEN,

7  FOUR DAYS LATER THE SEARCH WAS COMPLETED AND REPORTS WERE

8  CREATED.

9  **THE COURT:**  SO BY "COMPLETED" YOU MEAN ADDITIONAL OR

10  FURTHER SEARCHES OF THE COMPUTER?

11  **MR. MARTIKAN:**  CORRECT.

12  **THE COURT:**  AND WHERE DID THOSE OCCUR?

13  **MR. MARTIKAN:**  THE FOUR DAYS LATER, THAT SEARCH

14  OCCURRED AT ICE IN SAN FRANCISCO.

15  **THE COURT:**  ALL RIGHT. SO LET ME GO BACK AND ASK YOU

16  THIS QUESTION, COUNSEL. I WOULD LIKE TO FIND OUT, BECAUSE MAYBE

17  IT WILL HELP CRYSTALIZE THE ISSUE.  MAYBE IT WILL AVOID YOUR

18  GOING ON MAYBE A LEGAL WILD GOOSE CHASE HERE, WHICH IS THE

19  QUESTION IS GOING TO BE:  DOES THE DEFENDANT DISPUTE THE

20  FOLLOWING LEGAL PRINCIPLES?

21  ONE EXCEPTION TO THE WARRANT REQUIREMENT IS THAT A

22  SEARCH CONDUCTED AT THE INTERNATIONAL BORDER, WHICH IS BY ITS,

23  QUOTE:

24  "VERY NATURE REASONABLE UNDER THE FOURTH AMENDMENT

25  AND REQUIRES NEITHER A WARRANT, NOT -- NEITHER A

1              WARRANT, PROBABLE CAUSE OR EVEN ARTICULABLE

2              SUSPICION," UNQUOTE.

3              AND THAT'S QUOTING UNITED STATES VERSUS ALPHONSO, 759

4    F.2D 728 AT 733 TO 34.

5              IT'S A NINTH CIRCUIT 1985 CASE.  AND ALSO FOR THE

6    SAME PROPOSITION, UNITED STATES VERSUS ROMM, R-O-M-M, 455 F.3D,

7    990 AT 996, A NINTH CIRCUIT CASE DECIDED IN 2006.

8              ADDITIONALLY, QUOTE:

9              "SEARCHES OF INTERNATIONAL PASSENGERS AT AMERICAN

10             AIRPORTS ARE CONSIDERED BORDER SEARCHES BECAUSE THEY

11             OCCUR AT THE, QUOTE, 'FUNCTIONAL EQUIVALENT OF THE

12             BORDER,'" END OF THE INTERNAL QUOTE AND THE BIG

13   QUOTE, CITING UNITED STATES VERSUS ARNOLD, 533 F.3D 1003 AT

14   1006, A NINTH CIRCUIT CASE DECIDED IN 2009 WHICH, IN TURN,

15   QUOTES ALMEIDA SANCHEZ, A-L-M-E-I-D-A S-A-N-C-H-E-Z V. UNITED

16   STATES, 413 U.S. 266 AT 273, DECIDED IN 1973.

17             SO DO YOU DISPUTE THOSE PRINCIPLES AS ENUNCIATED BY

18   THE NINTH CIRCUIT AND THE UNITED STATES SUPREME COURT?

19             **MR. BIGELEISEN:**  YOUR HONOR, NOT TO THE EXTENT THAT

20   THE COURT HAS ARTICULATED THOSE.  AND, OF COURSE, THAT'S GOING

21   TO BE ONE OF THE THINGS THAT WE'RE GOING TO ASK THE COURT TO

22   REVIEW AND CONSIDER WHEN THE MATTER IS PRESENTED FOR A MOTION TO

23   SUPPRESS.

24             WE HAVE -- AND THIS IS NOW MOVING AHEAD A LITTLE BIT.

25   BUT WE HAVE FOUND A LINE OF CASES WHICH SAYS THAT A PLENARY

1   BORDER SEARCH IS NOT PERMITTED IF IT IS PART OF AN ONGOING

2   CRIMINAL INVESTIGATION.

3          AND THAT IS ONE OF THE THINGS THAT WE WILL WANT TO

4   BRIEF TO YOU.  AND KNOWING WHAT IT WAS THAT THE FEDERAL

5   GOVERNMENT KNEW AT THE TIME THAT MR. KYLE ENTERED THE COUNTRY

6   WILL HELP US TO PRESENT THAT TO YOU COMPLETELY TO HELP YOU TO

7   MAKE A DECISION IN THAT REGARD.

8          SO THAT'S ONE THING.  SO, IN OTHER WORDS, WHAT DID

9   THE SAN FRANCISCO POLICE DEPARTMENT SAY TO THE CUSTOMS PEOPLE AT

10  THE BORDER BEFORE MR. KYLE ARRIVED THAT PROVOKED THEM TO SEARCH

11  HIS CELL PHONE AND HIS COMPUTER?  AND WAS THIS PART OF AN

12  ONGOING CRIMINAL INVESTIGATION?

13          **MR. MARTIKAN:**  AND THEN, OF COURSE --

14          **THE COURT:**  ARE YOU SAYING -- ARE YOU SAYING THAT

15  THIS IS PART OF AN ONGOING CRIMINAL INVESTIGATION, THESE CASES

16  THAT YOU'RE ALLUDING TO, CONSTITUTE AN EXCEPTION TO THE GENERAL

17  RULE THAT A BORDER SEARCH IS APPROPRIATE UNDER THE FOURTH

18  AMENDMENT WITH OR WITHOUT PROBABLE CAUSE?

19          **MR. BIGELEISEN:**  I BELIEVE THAT THERE IS CASE LAW

20  THAT SUPPORTS THAT.  AND, IN FACT, THE COURT REMARKED ON THE

21  ARNOLD CASE, WHICH I LOOKED AT VERY BRIEFLY BEFORE I CAME IN

22  THIS MORNING.  AND I THINK THAT THE ARNOLD CASE, ALTHOUGH IT

23  DOESN'T SAY SO DIRECTLY, SEEMS TO ADMIT OF THAT, AS WELL.

24          IN ANY EVENT, WHAT I'M SAYING IS THAT'S SOMETHING I

25  WOULD LIKE TO HAVE AN OPPORTUNITY TO BRIEF TO THE COURT

1   ADEQUATELY SO THAT THE COURT WILL BE ABLE TO DECIDE.

2            **THE COURT:**  WELL, YOU HAVE THAT OPTION.  BUT WE'RE AT

3   A DISCOVERY HEARING.  AND THE QUESTION I HAVE IS:  WHAT MORE ARE

4   YOU SEEKING?  AND THE REASON I ASK THAT QUESTION IS ALL THE

5   COURT HAS IS WHAT THE PARTIES PRESENTED IN CONNECTION WITH THIS

6   MOTION.

7            AND IT'S FAIRLY CLEAR TO THE COURT WHAT HAPPENED

8   HERE. THERE WAS WHAT I MENTIONED BEFORE, THE CHAT INCIDENT AND

9   THE ALLEGED SHARING ONLINE WITH THE UNDERCOVER AGENT LEADING TO

10  THE SEARCH OF THE DEFENDANT'S HOUSE, WHICH FOUND SOME

11  INFORMATION, COMPUTERS WHICH INDICATED THAT THE DEFENDANT WAS

12  OUT OF THE COUNTRY AND RETURNING FIVE DAYS LATER.

13           THE ICE PEOPLE AND THE CUSTOMS PEOPLE WERE TIPPED OFF

14  THE DEFENDANT WOULD BE COMING IN. PURSUANT TO THAT TIP THE

15  DEFENDANT'S COMPUTER AND PHONE WAS SEARCHED.  AND THE RESULTS

16  WERE THERE. SO YOU HAVE YOUR ISSUE.

17           MR. MARTIKAN, AM I MISSING ANYTHING IN SORT OF BOLD

18  STROKES HOW THIS WHOLE THING OCCURRED?

19           **MR. MARTIKAN:**  NO, EXCEPT IT'S ALSO PROBABLY WORTH

20  THROWING IN THAT THE DEFENDANT WAS ARRESTED AT THE AIRPORT. SO

21  IT'S A LITTLE BIT UNLIKE SOME OF THE TYPICAL BORDER SEARCH CASES

22  BECAUSE HE'S ACTUALLY ARRESTED, SO HE WOULD HAVE BEEN SUBJECT TO

23  SEARCH INCIDENT TO ARREST, AS WELL.

24           **THE COURT:**  ARRESTED AFTER THE SEARCH OR BEFORE THE

25  SEARCH?

1          **MR. MARTIKAN:**  HE WAS ARRESTED -- WELL, THERE WAS AN

2    INITIAL SEARCH.  THEN, HE WAS ARRESTED ON LOCAL WARRANTS, AND

3    THEN THAT SEARCH WAS COMPLETED FOUR DAYS LATER.

4          **THE COURT:**  ALL RIGHT.  SO THE QUESTION REALLY IS

5    GOING BACK TO THE PURPOSE OF WHY WE'RE HERE.  GIVEN INFORMATION

6    THAT THIS COURT KNOWS FROM THE -- WHAT WAS PRESENTED BY THE

7    PARTIES AND IN SUPPORT OF THE MOTION, THE EVIDENTIARY MATERIAL,

8    THE DISCOVERY MATERIAL, WHAT MORE DOES THE DEFENDANT WANT TO

9    KNOW?

10          **MR. BIGELEISEN:**  I WANT TO KNOW WHAT INFORMATION HAD

11   BEEN COMMUNICATED TO THE PEOPLE AT THE BORDER BY THE SAN

12   FRANCISCO POLICE DEPARTMENT BEFORE THEY STOPPED MR. KYLE AND

13   BEGAN TO QUESTION HIM AND BEFORE THEY ARRESTED HIM.

14          IN OTHER WORDS, WHAT DID THEY HE KNOW?  WHAT DID THE

15   GOVERNMENT KNOW WHEN MR. KYLE ENTERED THE COUNTRY.  THAT'S WHAT

16   I WANT TO KNOW.

17          **THE COURT:**  ISN'T THAT BEFORE THE COURT?  THERE WAS A

18   WARRANT ISSUED AND THEY SEARCHED THE DEFENDANT'S HOUSE.  THEY

19   FOUND THESE -- THE COMPUTER, AND THEY FOUND INFORMATION WHICH

20   LED THEM TO BELIEVE THAT THE DEFENDANT WAS COMING BACK INTO THE

21   COUNTRY ON MARCH THE 15TH, RIGHT?  ISN'T THAT WHAT -- ISN'T THAT

22   WHAT THE RECORDS SHOW?

23          **MR. BIGELEISEN:**  IF THE COURT IS REFERRING TO THE

24   MATTER, THE MATERIALS THAT WERE ADDUCED BY THE SAN FRANCISCO

25   POLICE DEPARTMENT, YES. THE QUESTION IS:  WHAT OF THAT

1    INFORMATION HAD BEEN COMMUNICATED TO THE CUSTOMS AND ICE PEOPLE

2    THAT THEY ACTED UPON AT THE BORDER?   THAT'S WHAT I WANTED TO

3    KNOW.

4          **THE COURT:**   WELL, THE PROBLEM IS THIS IS NOT A CIVIL

5    CASE WHERE YOU GET INTERROGATORIES. YOU GET MATERIALS THAT ARE

6    COVERED BY THE FEDERAL RULES, BRADY, AND ANY COMMON LAW.

7          AND SO UNLESS THERE'S A REPORT, A DOCUMENT THAT HAS

8    NOT BEEN TURNED OVER THAT IS OTHERWISE DISCLOSEABLE THAT YOU ARE

9    ENTITLED TO, THEY DON'T HAVE TO SIT HERE AND TELL YOU

10   INFORMATION UNLESS IT'S EMBODIED IN SUCH A DISCOVERABLE

11   DOCUMENT.

12         MR. MARTIKAN, IS THERE ANYTHING ADDITIONAL THAT THE

13   DEFENDANT WAS NOT GIVEN THAT WOULD REFLECT INFORMATION, WHATEVER

14   INFORMATION WAS PROVIDED TO THE FEDERAL AUTHORITIES AT THE

15   BORDER FROM THE SAN FRANCISCO POLICE?

16         **MR. MARTIKAN:**   NO.  AS FAR AS I KNOW -- AND I'M

17   FAIRLY CERTAIN OF THIS -- WE HAVE EVERYTHING WE -- WE HAVE

18   EVERYTHING FROM THE SFPD THAT THEY GENERATE.

19         **THE COURT:**   ALL RIGHT.  WELL, I THINK YOU HAVE --

20   WHATEVER YOUR ISSUE IS, YOU HAVE IT. YOU'LL BE ABLE TO ESTABLISH

21   THAT THE LOCALS NOTIFIED THE FEDS.  AND BASED UPON THAT THE

22   WARRANT WAS ISSUED.  ALTHOUGH, ACTUALLY, THE FEDS WERE INVOLVED,

23   AS WELL, WERE THEY NOT?  BECAUSE THEY WERE THE ONES WHO DID THE

24   UNDERCOVER, THE STING ONLINE.

25         **MR. MARTIKAN:**   INITIALLY. THE FBI, A DIFFERENT PART

1  OF THE FEDERAL GOVERNMENT, YES.

2          **THE COURT:**  ALL RIGHT.  SO THE BOTTOM LINE IS YOU

3  HAVE WHATEVER YOUR ENTITLED TO.

4          **MR. BIGELEISEN:**  IF WE HAVE IT, I'M HAPPY.  I WAS

5  CONCERNED ABOUT WHETHER THERE WAS A REPORT THAT THE BORDER

6  PEOPLE HAD CONCERNING THIS MATTER THAT WE DIDN'T HAVE.  THAT'S

7  WHAT I WANTED TO KNOW.

8          **THE COURT:**  IS THERE ANY SUCH THING?

9          **MR. MARTIKAN:**  I'M SURE THAT THERE IS -- NOT A

10  REPORT, BUT I'M SURE THERE'S A RECORD, A COMPUTER-GENERATED

11  RECORD THAT HAS THE DEFENDANT'S NAME ON IT SO THAT THEY WOULD

12  KNOW TO LOOK OUT FOR HIM.

13          **THE COURT:**  WELL, IF THERE'S ANY SUCH INFORMATION, DO

14  YOU HAVE ANY OBJECTION TO ASKING AND THEN TURNING IT OVER?

15          **MR. MARTIKAN:**  YES, BECAUSE I DON'T THINK IT'S

16  DISCOVERABLE AS A GENERAL MATTER.  BUT I ALSO THINK THAT IT'S

17  A -- I MEAN, IT'S AN INTERNAL LAW ENFORCEMENT REPORT THAT THEY

18  RELY ON.

19          **THE COURT:**  WELL, HAVE YOU SEEN THIS REPORT?

20          **MR. MARTIKAN:**  NO, I HAVEN'T SEEN IT.  I'M

21  SPECULATING THAT HIS NAME MUST HAVE BEEN WRITTEN DOWN

22  SOMEWHERE.

23          **THE COURT:**  YOU DON'T HAVE IT, THOUGH.

24          **MR. MARTIKAN:**  NO.

25          **THE COURT:**  WELL, HE CAN'T GIVE YOU WHAT HE DOESN'T

1   HAVE.  AND IF IT'S JUST A NAME, THERE'S NO DISPUTE THAT IT

2   WAS -- PUTTING IT IN THE VERNACULAR, THE LOCALS DROPPED THE DIME

3   ON YOUR CLIENT TO THE FEDS.  AND THAT'S WHY THEY PICKED HIM UP;

4   IS THAT CORRECT, MR. MARTIKAN, BASICALLY?

5          **MR. MARTIKAN:**  YES.

6          **THE COURT:**  WELL, YOU HAVE YOUR ISSUE, AND I'M

7   DENYING THE MOTION. I'M DENYING THE MOTION AT THIS POINT.

8          SO WITH RESPECT TO PHOTOS, THE DEFENDANT CLAIMS

9   THAT -- HE SAYS THAT IT APPEARS THAT THERE ARE MANY IMAGES THAT

10  HAVE NOT BEEN PRODUCED.  THE GOVERNMENT HAS NOT HAD AN

11  OPPORTUNITY RESPOND THIS ISSUE, AS I -- SO FAR WHEN I LAST

12  LOOKED AT THIS, AS IT WAS RAISED IN THE REPLY.

13         SO WHAT IS THE ISSUE WITH RESPECT TO IMAGES TO WHICH

14  THE DEFENDANT MAY BE ENTITLED?

15         **MR. MARTIKAN:**  I DON'T THINK THERE'S AN ISSUE, YOUR

16  HONOR, BECAUSE WE'VE ENTERED INTO A PROTECTIVE ORDER. WE DID

17  EARLY ON IN THIS CASE.

18         THE IMAGES I'M FAIRLY CERTAIN WE'RE TALKING ABOUT ARE

19  CONTRABAND IMAGES THAT ARE ON THESE COMPUTERS, AND THEY ARE

20  AVAILABLE TO THE DEFENSE AND REMAIN AVAILABLE TO THE DEFENSE TO

21  COME AND LOOK AT.

22         **THE COURT:**  ALL RIGHT. WHAT'S --

23         **MR. BIGELEISEN:**  WE'VE GOTTEN A LOT MORE DISCOVERY

24  SINCE WE STARTED ON THIS, YOUR HONOR. I THINK I'D LIKE TO DEFER

25  THAT AND TAKE A LOOK FURTHER AT WHAT WE HAVE.  AND IF WE NEED TO

1    REVISIT IT, I'LL BRING IT BEFORE YOU.

2              **THE COURT:**  ALL RIGHT.  FAIR ENOUGH.  AND MAYBE IF

3    THE GOVERNMENT HAS READILY AVAILABLE AN INVENTORY OF THE PHOTOS,

4    THE IMAGES THAT THEY ARE RELYING ON, THEY COULD SEND IT TO THE

5    DEFENDANT AND HE CAN CHECK IT AGAINST HIS LIST AND PURSUANT TO

6    THE PROTECTIVE ORDER, IF THERE'S ANYTHING MORE THEN THE

7    GOVERNMENT WILL MAKE IT AVAILABLE.

8              IS THAT ACCEPTABLE TO THE GOVERNMENT?

9              **MR. MARTIKAN:**  YES, I THINK THAT'S BEEN DONE. WHAT

10   ICE DOES, AND TYPICALLY WHAT LAW ENFORCEMENT FORENSICS LABS DO

11   IS THEY RUN A SOFTWARE PROGRAM.  ONE OF THEM IS CALLED "FTK" OR

12   FORENSIC TOOL KIT THAT CATALOGUES ALL OF THE IMAGES ON A

13   COMPUTER AND VIDEOS.

14             AND IT GENERATES A REPORT THAT LISTS THEM AND SHOWS

15   WHERE THEY ARE AS WELL AS THE META DATA FOR THOSE IMAGES.

16             AND THAT HAS BEEN TURNED OVER TO THE DEFENSE MINUS

17   THE IMAGES.  AND SO THEY CAN COME AND SEE THAT REPORT WITH THE

18   IMAGES, OR THEY CAN HAVE THEIR EXPERT COME IN AND BASICALLY DO

19   THE SAME THING AND MAKE HIS OR HER OWN ANALYSIS.

20             **THE COURT:**  ALL RIGHT. SO THERE YOU GO. SOUNDS LIKE

21   YOU ARE GOING TO GET WHAT YOU WANT.

22             **MR. BIGELEISEN:**  I DON'T THINK THAT'S GOING TO BE A

23   PROBLEM. I DON'T WANT TO TROUBLE THE COURT WITH IT ANY FURTHER.

24             IF SOMETHING ELSE COMES UP, WE WILL COME BACK, BUT

25   WE'RE HAPPY TO WORK WITH COUNSEL ON THAT.

1      **THE COURT:**  ALL RIGHT, VERY WELL.

2          NOW, THE NEXT ISSUE THAT WAS RAISED IN THE REPLY, SO

3   I'LL NEED TO GET THE GOVERNMENT'S POSITION, HAS TO DO WITH THE

4   ANALYSIS OF THE CAMERA.  AND THE DEFENDANT WANTS TO KNOW HOW THE

5   GOVERNMENT CAN LINK SOME IMAGES FOUND ON HIS COMPUTER TO A

6   DIGITAL CAMERA FOUND IN THE APARTMENT.

7          IS THERE ANYTHING YOU CAN SHED?  IS THERE THINKING

8   THAT EXISTS IN THAT REGARD?

9      **MR. MARTIKAN:**  YES.  AND THAT'S REALLY PART OF THE

10  SAME THING, YOUR HONOR.  WHAT LINKS -- WE HAVE A CAMERA.  BUT

11  WHAT LINKS THE IMAGES TO THE CAMERA IS ACTUALLY ON THE COMPUTER

12  AND NOT IN THE CAMERA.  THE COMPUTER HAS IMAGES AND MANY OF

13  THOSE IMAGES HAVE META DATA THAT IDENTIFY THE CAMERA THAT THEY

14  COME FROM.  SO THAT'S --

15     **THE COURT:**  AND THAT'S WHAT YOU'RE MAKING AVAILABLE

16  TO THE DEFENDANT?

17     **MR. MARTIKAN:**  YES.

18     **THE COURT:**  ALL RIGHT.  SO THERE YOU GO.

19     **MR. MARTIKAN:**  IT'S SORT OF THAT SAME REPORT.

20     **THE COURT:**  THERE YOU GO. YOU HAVE IT OR YOU WILL

21  SOON HAVE IT.

22         HAS THAT ALREADY BEEN DISCLOSED?

23     **MR. MARTIKAN:**  WELL, AS I SAID, THE REPORT MINUS THE

24  IMAGES HAS BEEN DISCLOSED. IF THEY WANT TO SEE THE ACTUAL

25  PICTURE THAT GOES WITH THE META DATA THEY WOULD HAVE TO COME AND

1    LOOK AT IT.  BUT IT'S BEEN AVAILABLE. IT IS AVAILABLE.

2              **THE COURT:**  SO SEEMS LIKE THAT PARTICULAR REQUEST IS

3    MOOT AT THIS POINT.

4              **MR. BIGELEISEN:**  WE HAVE SEEN SOME OF THE

5    PHOTOGRAPHS, YOUR HONOR.

6              **THE COURT:**  ALL RIGHT.  IF THERE'S ANY YOU FEEL YOU

7    DON'T HAVE -- THE GOVERNMENT BELIEVES IT'S TURNED ACCESS OVER TO

8    YOU TO ALL OF THEM -- THEN PLEASE LET THEM KNOW, AND I'M SURE

9    THEY WILL LET YOU SEE THEM.

10             SO ARE THERE ANY ISSUES THAT ARE LEFT?  BECAUSE I

11   THINK I SUMMARIZED AS BEST I COULD, EVEN INCLUDING THE REPLY,

12   WHAT SEEMED TO BE AT ISSUE.

13             **MR. BIGELEISEN:**  YOUR HONOR, THERE'S ONE OTHER

14   MATTER.  AND THAT IS THERE WAS, I BELIEVE, A LOG OF THE COMPUTER

15   SESSION WHICH THE FBI AGENT HAD WITH MR. KYLE.  AND THE

16   GOVERNMENT HAS SAID THEY DO NOT WANT TO PRODUCE THIS.

17             I'LL TELL YOU WHY I'M INTERESTED TO SEE IT. AND THAT

18   IS THE GOVERNMENT HAS MAINTAINED THROUGHOUT THAT THEIR INITIAL

19   COMMUNICATION WITH MR. KYLE HAS BEEN PEER TO PEER.  IF THAT IS

20   THE CASE, THAT SETS THE TONE OF OUR DISCUSSION WITH REGARD TO

21   THE FOURTH AMENDMENT REVIEW OF THAT INITIAL COMMUNICATION.

22             HOWEVER, IF THE SCOPE OF THE GOVERNMENT'S

23   INVESTIGATION WAS OTHER THAN PEER TO PEER, THEN WE HAVE A

24   DIFFERENT ISSUE THAT WE WILL BRING BEFORE YOU.

25             AND, FOR EXAMPLE, IF THE INVESTIGATION WAS MORE IN

1   THE NATURE OF A WIRETAP OR A SEARCH OF ONE'S PAPERS, AS THE

2   FOURTH AMENDMENT WAS CONTEMPLATED, THEN WE WOULD BRING SOMETHING

3   ELSE BEFORE YOU.

4           AND WE THINK THAT THE LOG WILL TELL US WHETHER THIS

5   WAS, INDEED, LIMITED TO PEER TO PEER OR WHETHER THERE WAS MORE

6   TO IT THAT WE DON'T KNOW ABOUT.

7           **THE COURT:**  ALL RIGHT.

8           **MR. BIGELEISEN:**  SO THAT'S WHY I WANT TO KNOW ABOUT

9   IT.

10          **THE COURT:**  MR. MARTIKAN.

11          **MR. MARTIKAN:**  WELL, YOUR HONOR, IT WAS A PEER TO

12  PEER INVESTIGATION. I MEAN, THE REPORTS THAT HAVE BEEN TURNED

13  OVER MAKE THAT CLEAR.

14          THIS IS A PARTICULAR PEER TO PEER CLIENT THE FBI

15  INVESTIGATES USING UNDERCOVER NAMES.  SOME THAT THEY FRANKLY

16  MAKE UP AND SOME THAT THEY GET FROM OTHER PEOPLE WHO HAVE BEEN

17  ARRESTED. AND THEY USE THOSE TO GET INTO THIS PEER-TO-PEER

18  NETWORK AND DOWNLOAD IMAGES AND VIDEOS. SO IT IS PEER TO PEER.

19          **THE COURT:**  OKAY.  BUT IN TERMS OF THE DISCOVERY

20  REQUEST, IS THERE EITHER A LOG OR SOME DOCUMENTATION THAT THE

21  UNDERCOVER AGENT WAS KEEPING AS SHE WAS HAVING HER ALLEGED

22  COMMUNICATIONS WITH THE DEFENDANT?

23          **MR. MARTIKAN:**  THERE IS -- THERE IS NOT A LOG THAT

24  THE AGENT CREATES. THERE IS A LOG THAT THE COMPUTER CREATES

25  WHICH IS LARGELY UNINTELLIGIBLE TO US HUMANS.  THE ONLY ISSUE --

1    I MEAN, THE ISSUE THAT THE AGENT HAS IS THAT THAT LOG IN ONE

2    SESSION THAT THAT UNDERCOVER AGENT MAY BE USING SEVERAL

3    DIFFERENT CODE NAMES, WHICH SHE DOES NOT WANT TO DISCLOSE.

4              **THE COURT:**  NOW, THERE SHOULD BE A WAY, HOWEVER, THE

5    NAME -- YOU'VE ALREADY DISCLOSED THE IDENTITY SHE WAS USING TO

6    COMMUNICATE WITH THIS DEFENDANT.

7              ISN'T THERE A WAY OF SANITIZING THAT SO THAT ONLY THE

8    SCREEN NAME SHE USED AND ONLY THE COMMUNICATIONS WITH THE

9    DEFENDANT, EVEN THOUGH THIS MAY BE, YOU KNOW, TO HUMANS

10   GIBBERISH, COULD BE PRESENTED?

11             **MR. MARTIKAN:**  I MEAN, THERE'S ALWAYS A WAY OF

12   SANITIZING DOCUMENTS.

13             **THE COURT:**  ALL RIGHT. WHY DON'T YOU ASK THE COMPUTER

14   FOLKS AT THE FBI?  I'M SURE THIS COULD BE DONE.  AND I DON'T

15   KNOW WHERE IT'S GOING TO LEAD, BECAUSE IT WAS FAIRLY MANIFEST TO

16   THE COURT FROM THE REPORTS THAT WERE ATTACHED, MANY OF THEM BY

17   THE DEFENDANT, THE DISCOVERY FROM THE GOVERNMENT, INDICATING

18   THAT THIS WAS A CLASSIC UNDERCOVER PEER-TO-PEER COMPUTER STING,

19   RATHER THAN ANY KIND OF WIRETAP.  OR I DON'T KNOW EVEN HOW THAT

20   WOULD WORK IN THE SENSE THAT THE COMPUTER IS SITTING IN VIRGINIA

21   CHATTING ON A COMPUTER USING, YOU KNOW, AN ASSUMED NAME AND THEN

22   SHARING -- ALLEGEDLY SHARING THESE FILES.

23             SO I DON'T KNOW WHAT'S THERE.  BUT WHY DON'T YOU LOOK

24   INTO THAT?  AND HOW SOON CAN YOU DO THAT?

25             **MR. MARTIKAN:**  I COULD -- WELL, TOMORROW'S A HOLIDAY.

1    I MEAN, IT'S JUST A PHONE CALL TO AN AGENT.

2              **THE COURT:**  ALL RIGHT. WHY DON'T YOU TALK TO DEFENSE

3    COUNSEL ABOUT IT?  AND IF IT CAN BE DONE IN A WAY THAT DOESN'T

4    COMPROMISE.

5              AND I'M NOT EVEN SURE THAT THIS IS -- THAT I CAN EVEN

6    ORDER YOU TO DO THIS.  BUT I'M EXHORTING YOU TO DO IT BECAUSE IT

7    SEEMS THAT IT WOULD NOT BE CONTROVERSIAL. SO I'D LIKE TO KNOW

8    ABOUT THAT.

9              OH, OKAY.  I'VE GOT NOTE THAT JUDGE CHESNEY IS

10   WAITING FOR YOU ON YOUR 2:00 O'CLOCK.

11             **MR. MARTIKAN:**  IT'S AN EXCITING DAY, YOUR HONOR, YES.

12   I WILL LOOK INTO THAT.

13             **THE COURT:**  ALL RIGHT.  ALL RIGHT.  I'M GOING TO MAKE

14   THIS GO MORE QUICKLY NOW.

15             THERE'S A -- I WANT TO ADVISE THE PARTIES THAT THERE

16   ARE PROBLEMS EXISTING IN EXHIBIT 26, WHICH HAS THE VICTIM'S

17   FIRST NAME.  AND THAT NEEDS TO BE REDACTED.  AND THE DOCUMENT

18   HAS BEEN LOCKED.  AND I WANT THE DOCUMENT FULLY REDACTED WITHOUT

19   ANY NAMES IN THERE AND FILED UNDER SEAL OR FILED APPROPRIATELY,

20   ALL RIGHT, COUNSEL?

21             **MR. BIGELEISEN:**  ABSOLUTELY. THANK YOU, YOUR HONOR,

22   VERY MUCH FOR CALLING THAT TO MY ATTENTION.  I APOLOGIZE.

23             **THE COURT:**  THAT'S ALL RIGHT. THAT'S ALL RIGHT.

24             HERE'S WHAT I WANT TO DO BEFORE MR. MARTIKAN -- THE

25   MARSHAL COMES FOR MR. MARTIKAN TO TAKE HIM INTO CUSTODY.  WE

1   DON'T WANT THAT TO HAPPEN.

2              BUT I WOULD LIKE YOU TO GET YOUR CALENDARS OUT. I

3   WANT TO FLAT SET A DEADLINE. THIS IS WHAT THE COURT WANTS TO DO

4   GIVEN THE ISSUES IN THIS CASE AND THE AGE OF THIS CASE.  I WANT

5   ANY MOTION TO SUPPRESS FULLY BRIEFED BY THE HOLIDAYS, AND I WANT

6   TO HAVE A HEARING IN EARLY JANUARY ON ANY MOTION TO SUPPRESS.

7              **MR. BIGELEISEN:**  YOUR HONOR, MAY I ASK THE COURT'S

8   GRACE IN THAT REGARD?  I'M GOING TO HAVE SURGERY ON THE 29TH OF

9   THIS MONTH.  AND THE DOCTOR HAS TOLD ME THAT I SHOULD BE OUT OF

10  WORK FOR A WEEK THEREAFTER, AND THEN COME BACK PART-TIME ON THE

11  SIXTH OF DECEMBER.

12             AND SO IF THE COURT WOULD BE KIND ENOUGH TO ADJUST

13  THAT A LITTLE BIT, I'D BE VERY GRATEFUL.

14             **THE COURT:**  WELL, SO YOU ARE GOING OUT ON THE 29TH.

15  TODAY IS THE 14TH?  ELEVENTH.

16             **THE CLERK:**  TENTH.

17             **THE COURT:**  TENTH.

18             **MR. BIGELEISEN:**  YES.

19             **THE COURT:**  SO YOU'VE GOT 19 DAYS TO GET THIS ON FILE

20  BEFORE YOU GO OUT ON YOUR SURGERY.  AND THEN, YOU'LL HAVE TIME.

21  YOU'LL HAVE AMPLE TIME TO REPLY.  SO WHY CAN'T YOU DO IT IN THAT

22  PERIOD OF TIME?

23             THIS IS NOT A COMPLICATED AREA. THERE'S NOT A LOT

24  OF -- YOU'VE GOT -- THE COURT IS NOT ORDERING ANY ADDITIONAL

25  DISCOVERY.

1          THE ISSUES ARE FAIRLY SIMPLE. I'VE GIVEN YOU SOME

2     CASES. YOU'VE GIVEN ME --YOU HAVE GIVEN THEM TO ME, BUT THE

3     ISSUES ARE QUITE CRYSTAL CLEAR.

4          THE WARRANTS, TO THE EXTENT YOU ARE GOING TO ATTACK

5     THEM, STANDS ON THEIR OWN FOUR CORNERS.  SO I DON'T KNOW WHY YOU

6     NEED MORE THAN 19 DAYS TO GET THIS ON FILE.

7          SO THAT'S WHAT YOU ARE GOING TO GET.

8          MS. OTTOLINI, LET'S PICK A DATE BY THE END OF THIS

9     MONTH.

10          **THE CLERK:**  SO FRIDAY, NOVEMBER 26TH.

11          **THE COURT:**  ALL RIGHT.

12          **MR. BIGELEISEN:**  IF I --

13          **THE COURT:**  MR. MARTIKAN, HOW MUCH TIME TO RESPOND,

14     TWO WEEKS?

15          **MR. MARTIKAN:**  TWO WEEKS WOULD BE DECEMBER 10TH?

16          **THE CLERK:**  TENTH.

17          **MR. MARTIKAN:**  YES.

18          **THE COURT:**  ALL RIGHT.  AND REPLY BY THE 17TH.

19          IS THAT THE RIGHT DAY OF THE WEEK, MS. OTTOLINI?

20          **THE CLERK:**  YES.

21          **THE COURT:**  AND LET'S SET A HEARING IN JANUARY,

22     SPECIALLY SET HEARING.  I DON'T WANT TO DO THIS ON THE REGULAR

23     CALENDAR.

24          **THE CLERK:**  DO YOU WANT IT THE FIRST WEEK OF JANUARY

25     OR THE SECOND WEEK OF JANUARY, YOUR HONOR?

1              **THE COURT:**  MID-JANUARY.

2              **THE CLERK:**  SO JANUARY -- ON A WEDNESDAY?

3              **THE COURT:**  PARDON ME?

4              **THE CLERK:**  I WAS JUST LOOKING AT OUR CALENDAR.

5              **THE COURT:**  ANY WEEKDAY THAT IS OPEN OTHER THAN

6    THURSDAY, THURSDAY AFTERNOON.

7              **THE CLERK:**  RIGHT.  WE'D HAVE TO GO TO THE WEEK OF

8    THE 18TH.

9              **THE COURT:**  FINE.  LET'S DO IT.

10             **THE CLERK:**  SO JANUARY 19TH.  MORNING OR AFTERNOON?

11             **THE COURT:**  MORNING.

12             **THE CLERK:**  AT 9:00 A.M.

13             **THE COURT:**  ALL RIGHT.  AND, COUNSEL, IF YOU BELIEVE

14   YOU ARE ENTITLED TO AN EVIDENTIARY HEARING, YOU SHOULD BE AS

15   SPECIFIC AS POSSIBLE IN TERMS OF WHAT KIND OF EVIDENCE -- WHAT

16   WITNESSES SO THE GOVERNMENT CAN MAKE THEM AVAILABLE.

17             **MR. BIGELEISEN:**  OF COURSE.

18             **THE COURT:**  AND THEN, THE COURT WILL RULE BASED UPON

19   THE GOVERNMENT'S RESPONSE ON WHETHER IT BELIEVES AN EVIDENTIARY

20   HEARING IS APPROPRIATE.

21             **MR. BIGELEISEN:**  AND OF COURSE I'LL GIVE THE COURT

22   OUR BEST ESTIMATE OF HOW LONG WE WILL SPEND, AS WELL.

23             **THE COURT:**  PERFECT. ALL RIGHT.

24             WELL, THANK YOU, COUNSEL.

25             ANYTHING FURTHER, MR. MARTIKAN?

1          **MR. MARTIKAN:**  NO, YOUR HONOR.  THANK YOU.

2          **MR. BIGELEISEN:**  THANK YOU VERY MUCH, YOUR HONOR.

3          **MR. MARTIKAN:**  OH, I'M SORRY. I'M SORRY, YOUR HONOR.

4          I THINK THAT TIME IS PROPERLY EXCLUDED FROM TODAY

5   UNTIL THE DAY THAT THE MOTION IS FILED ON THE 26TH FOR

6   PREPARATION OF COUNSEL SINCE WE WILL BE AT LEAST DISCUSSING

7   THESE DISCOVERY ISSUES, AND -- WELL, THAT'S THE REASON.

8          **THE COURT:**  ALL RIGHT.  DO YOU AGREE THAT THE TIME IS

9   PROPERLY EXCLUDABLE?

10         **MS. BRUGGISSER:**  I THINK PROBABLY IT SHOULD BE

11  EXCLUDED THROUGH THE 19TH OF JANUARY, BUT, YES.

12         **THE COURT:**  ALL RIGHT.  WELL, WHY DON'T YOU PREPARE

13  THE APPROPRIATE STIPULATION AND ORDER THROUGH THE 19TH OF

14  JANUARY?

15         **MR. MARTIKAN:**  THANK YOU.

16         **MR. BIGELEISEN:**  THANK YOU.

17         (THEREUPON, THIS HEARING WAS CONCLUDED.)

18  STENOGRAPHY CERTIFICATION

19         "I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
    FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER."
20         /S/ KATHERINE WYATT
           DATE 7-11-12
21         KATHERINE WYATT

22

23

24

25

KATHERINE WYATT, OFFICIAL REPORTER, RPR, RMR  925-212-5224